**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **2:19-cv-000547-LJO-EPG** |
| **Plaintiffs,** | |
| | **ORDER RE MOTION TO DISMISS, RESOLVING ABSTENTION ISSUES AND REQUIRING FURTHER BRIEFING ON CERTAIN REMAINING ISSUES (ECF NO. 17)** |
| **v.** | |
| **STATE WATER RESOURCES CONTROL BOARD & STATE WATER RESOURCES CONTROL BOARD CHAIR E. JOAQUIN ESQUIVEL, in his official capacity,** | |
| **Defendants.** | |

## I. <u>INTRODUCTION</u>

On March 28, 2019, Plaintiff United States of America filed two similar lawsuits, one in Sacramento County Superior Court, the other in this Court, concerning amendments adopted by Defendant State Water Resources Control Board ("State Water Board" or "the Board") to the Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary ("Bay-Delta Plan Amendments," "Amendments," or "Amended Plan"). *See* ECF No. 1; ECF No. 18 (Request for Judicial Notice ("RJN")), Ex. 6. The First Amended Complaint ("FAC") in this (the federal) action raises three causes of action under the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code §§ 21000 *et seq.*,–(1) failure to provide an accurate, stable and finite project description; (2) improper compression of impacts and mitigation; and (3) failure to adequately evaluate impacts–along with (4) a cause of action based upon the federal constitutional intergovernmental immunity ("IGI")

doctrine. ECF No. 14. The United States' state court complaint alleges the same three causes of action under CEQA but omits the IGI claim. RJN, Ex. 6 (ECF No. 18-6).

Before the Court for decision is Defendants' motion to dismiss. ECF No. 17. The motion argues dismissal of the entire lawsuit is warranted under four separate abstention doctrines: *Brillhart/Wilton*, *Burford*, *Pullman*, and *Colorado River*. The motion also argues that the IGI claim is unripe and fails as a matter of law on various grounds. Plaintiff opposed the motion. ECF No. 20, and Defendants replied, ECF No. 21. On November 4, 2019, the Court ordered supplemental filings on one of the abstention issues, resulting in additional briefing. *See* ECF Nos. 26 & 27. The matter was taken under submission on the papers pursuant to Local Rule 230(g). ECF No. 22.

## II. <u>BACKGROUND</u>

### A.    <u>Factual Background</u>

The history of regulation and litigation of issues related to the San Francisco Bay/Sacramento-San Joaquin Delta Estuary ("Bay-Delta") is long, wide, and deep. Without question, the Bay-Delta itself is a critically important natural resource that is both the hub of California's water supply and a vital estuary and wetland supporting numerous beneficial uses. RJN, Ex. 1 at p. ES-1. Central to the present dispute is the fact that the State Water Board holds authority under California's Porter-Cologne Water Quality Control Act, Cal. Water Code § 13000, *et seq.*, to adopt water quality control plans to protect the waters of California. The Board adopted its original Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary ("Bay-Delta Plan") in 1978, and amended that plan in 1991, 1995, and 2006. RJN, Ex. 2, ¶ 3. The most recent effort to amend the Bay-Delta Plan began in 2009, and, over a nine-year period, the Board considered various amendments and prepared environmental documentation analyzing the potential environmental impacts of the Bay Delta Plan Amendments under CEQA. RJN Ex. 2, at ¶ 7; FAC ¶ 30.

The Board held numerous publicly-noticed meetings and reviewed thousands of comments regarding the proposed Amendments and related drafts of the Substitute Environmental Document

("SED") prepared in accordance with CEQA. RJN Ex. 2, at ¶ 7; FAC ¶ 30. On December 12, 2018, the Board adopted the SED and Amended Plan. RJN Ex. 2, at ¶ 7(g); FAC ¶ 31.

In general, the Amendments are designed to accomplish several goals relevant to this case. First, they increase the flows required to be left in the three main salmon-bearing tributaries to the San Joaquin River (the Stanislaus, Tuolumne, and Merced Rivers) during critical months (February through June) RJN, Ex. 3, at 15, 25-27; FAC ¶¶ 32-34. These flow increases are designed to improve spawning, rearing, and migratory habitat conditions in the Lower San Joaquin River. RJN Ex. 1, at ES-8, n. 6, ES-12. The Board plans to implement the flow objectives "adaptively," within broad constraints, to adjust timing and flow patterns to better balance multiple beneficial uses when scientific information indicates doing so is appropriate. *See* RJN, Ex. 3, at 25-26.

Second, the Amendments provide that the Board will include minimum reservoir carryover storage targets or other requirements to ensure that providing the flows to meet the objectives will not have adverse temperature or other impacts on fish and wildlife. RJN Ex. 3, at 24; FAC ¶¶ 38-39.

Third, the Amendments revise southern Delta salinity objectives for agriculture by adjusting the salinity requirements/restrictions to a slightly higher level, ostensibly to reflect updated scientific knowledge of southern Delta salt levels that reasonably protect agriculture. RJN Eh. 3, at 34-35; Ex. 1, at ES-5. More specifically, the Amended Plan revises the salinity objective for agricultural beneficial uses by increasing the April through August salinity objective from a mean daily electrical conductivity ("EC") of 0.7 deciSiemens per meter ("dS/m") to 1.0 dS/m, resulting in a 1.0 dS/m salinity objective for the four compliance locations year-round. RJN Ex. 3, at 12-13, Table 2; *see also* FAC ¶ 14 (explaining that dS/m is a "widely accepted indirect method of determining the salinity of water").

Reclamation's existing water rights to operate the federal Central Valley Project ("CVP"), including its permits to operate the New Melones Project, a component of the CVP, currently require Reclamation to meet the existing salinity objective of 0.7 dS/m at these locations. FAC at ¶ 48; *see* RJN Ex. 3, at 34. The Amended Plan proposes to implement the salinity objective for the interior southern

Delta by requiring Reclamation to continue operating to meet the 0.7 dS/m salinity limit at Vernalis as required by its existing water rights. RJN Exh. 3, at 34. The Amended Plan also proposes to implement the salinity objective through increased inflows provided by application of flow-based (as opposed to salinity-based) objectives for the Lower San Joaquin River. *Id*. at 38, ¶ vi.

**B.**   **Procedural History in State Court**

On March 28, 2019, the United States filed substantially similar actions in Sacramento County Superior Court, RJN Ex. 6 (Sacramento Cty. Sup. Court Case No. 34-2019-80003111-CU-WM-GDS), and this Courtk, ECF No. 1. The action here invokes the jurisdiction of this court pursuant to 28 U.S.C. § 1345 (United States as Plaintiff), among other bases.

The United States is not alone in challenging the Board's adoption of the Bay-Delta Plan Amendments. A total of twelve lawsuits were filed in state court between December 21, 2018, and April 22, 2019. RJN Ex. 4 (Order Granting Petition for Coordination and Motion for Stay), at 2-4; Ex. 5, at ¶ 5; Exs. 6-17. On February 21, 2019, the State Water Board filed a petition with the Judicial Council of California for coordination of the first nine cases. RJN Ex. 4.

On May 29, 2019, the Board filed a motion to dismiss in this case, raising various abstention arguments. ECF No. 9. On June 19, 2019, the United States filed its FAC, adding the single IGI claim. ECF No. 14. With respect to the CEQA claims, the FAC seeks a declaratory judgment that the State Water Board violated CEQA and an injunction preventing implementation or enforcement of the Bay-Delta Plan Amendments. FAC, at 20 (Prayer). In the alternative, the FAC seeks a mandamus writ directing the board to vacate the SED, suspend all activity under the Amended Plan, and prepare, circulate, and consider a revised and legally adequate SED. *Id*. With respect to the IGI claim, the FAC seeks declaratory and injunctive relief. *Id*.

On May 3, 2019, the United States filed a motion in state court to stay its state case pending

resolution of its federal case.[1] On May 8, 2019, the coordination motion judge ordered eleven of the twelve cases coordinated, leaving the United States' case to be considered separately for coordination. RJN Ex. 4, at 5-6. On May 24, 2019, the State Water Board filed a Petition for Coordination of the United States case as an Add-on case. RJN Ex. 22. That motion is still pending.

### III. ANALYSIS

**A.    Order of Analysis**

The focus of the pending motions is application of a variety of abstention doctrines. In addition, the Board has argued, primarily on ripeness grounds, that the Court lacks subject matter jurisdiction over the sole federal claim arising under the IGI doctrine. Normally, the Court would tackle the jurisdictional question first, for a variety of reasons. However, as discussed below, the Court is unable to decide definitively the ripeness question without further briefing. Moreover, because the United States invokes 28 U.S.C. § 1345 as a basis for jurisdiction, this Court arguably would have jurisdiction to hear the indisputably ripe CEQA claims even if no federal claim remained in the case. As such, the Court would be required to evaluate whether it should abstain from hearing the CEQA claims, even if the IGI claim were dismissed. In addition, the Court understands that the Superior Court for the County of Sacramento is awaiting this Court's decision on abstention before proceeding to rule on a motion to consolidate the United States' state CEQA claims with the numerous other CEQA cases challenging the Amended Plan which are already proceeding in that court. Finally, the Court believes the disposition of the IGI claim will make little or no difference to the outcome of the abstention analysis. As a result, the Court decides the abstention issues herein, declining to apply *Brillhart/Wilton*, *Burford*, or *Pullman*, but invoking *Colorado River* to stay only the CEQA claims in the FAC. The Court declines to stay the IGI claim and orders supplemental briefing on the justiciability issues raised in the pending motion.

---

[1] The Court takes judicial notice of the docket of Sacramento County Superior Court Case No. 34-2019-80003111-CU-WM-GDS, which can be viewed online for free at: https://services.saccourt.ca.gov/PublicCaseAccess/Civil/SearchByCaseNumber (last visited Nov. 4, 2019). The United States' stay petition is at Docket Entry No. 11.

**B.**      **Abstention Doctrine Analysis**

The Court notes that the United States appears to suggest that Federal Rule of Civil Procedure 12(b)(6) provides the rule of decision for its various abstention doctrine arguments. *See* ECF No. 17 at 1-3. In *Courthouse News Serv. v. Planet*, 750 F.3d 776, 779 n. 2 (9th Cir. 2014), when discussing abstention under *Pullman* and *O'Shea v. Littleton,* 414 U.S. 488 (1974), the Ninth Circuit noted that it has "not squarely held whether abstention is properly raised under Rule 12(b)(6), Rule 12(b)(1), both, or neither." In *Courthouse*, the Ninth Circuit determined it did not need to grapple with this distinction, because the defendant did not offer any evidence to contest the allegations in the complaint. Therefore, whether treated under Rule 12(b)(6), Rule 12(b)(1), or some other rubric, the abstention issues could be evaluated assuming the truth of the complaint's alleged facts. *Id.* at 779-80 & 779 n.2. This approach is appropriate here; the United States' invocation of only Rule 12(b)(6) in the context of its abstention doctrine arguments makes it clear that it does not intend to offer evidence in connection with these arguments.

     **1.**      ***Brillhart/Wilton***

Defendants first argue that the abstention doctrine set forth in *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942), and its progeny, including *Wilton v. Seven Falls Co*., 515 U.S. 277 (1995), compels dismissal of the United States' complaint.

The Declaratory Judgment Act ("DJA") provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). If a lawsuit seeking federal declaratory relief meets the constitutional requirements of presenting an actual case and controversy and fulfills statutory jurisdictional prerequisites, the district court must also be satisfied, in its discretion, that entertaining the action is appropriate. *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1222-23 (9th Cir. 1998) (en banc). "[T]he Declaratory Judgment Act is 'deliberately cast in terms of permissive, rather than mandatory, authority'" and gives federal courts discretion to make a

declaration of rights but does not impose a duty to do so. *Id.* at 1223 (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 250 (1952) (J. Reed, concurring)). The district court's discretion is not "unfettered"; instead, "[p]rudential guidance for retention of the district court's authority is found in *Brillhart* [], 316 U.S. 491 [ ], and its progeny." *Id.* at 1223; *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 144 (9th Cir. 1994) (In *Brillhart*, "[t]he Supreme Court has provided guidance for the exercise of the district court's discretionary decision whether to entertain declaratory relief.").

The Ninth Circuit has read *Brillhart* to articulate three factors courts should consider when examining the propriety of entertaining a declaratory judgment action: (1) avoiding needless determination of state law issues; (2) discouraging litigants from filing declaratory actions as a means of forum shopping; and (3) avoiding duplicative litigation. *Dizol*, 133 F.3d at 1225; *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011). These *Brillhart* factors are not exclusive and other factors for consideration when determining whether to exercise jurisdiction in declaratory judgment actions include:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005) (quoting *Dizol*, 133 F.3d at 1225 n. 5). "Although courts may also consider a number of other factors, the three '*Brillhart* factors remain the philosophic touchstone'" for the analysis. *R.R. St. & Co.*, 656 F.3d at 975 (*quoting Dizol*, 133 F.3d at 1225). "Essentially, the district court 'must balance concerns of judicial administration, comity, and fairness to the litigants.'" *Robinson*, 394 F.3d at 672 (quoting *Kearns*, 15 F.3d at 144).

However, *Brillhart* only applies where the plaintiff exclusively seeks declaratory relief. *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 840 (9th Cir. 2017) ("So long as the suit seeks more

than merely declaratory relief, . . . the entire action should be analyzed under the *Colorado River* [*Water Conservation District v. United States*, 424 U.S. 800 (1976),] framework."). Where a complaint contains claims for both declaratory and other forms of relief, a court must determine whether a suit "exclusively seeks declaratory relief," by asking "whether there are claims in the case that exist independent of any request for purely declaratory relief, that is, claims that would continue to exist if the request for a declaration simply dropped from the case." *Id.*

Here, the FAC seeks both declaratory and injunctive relief as to each claim. FAC at 20-21. The Ninth Circuit provided some guidance about how to evaluate such claims in *Scotts Co. LLC v. Seeds, Inc.*, 688 F.3d 1154, 1158-59 (9th Cir. 2012). There, a district court examined a complaint that sought both declaratory and non-declaratory relief, finding that all the claims shared a common request for an audit and that the plaintiff would have a basis for its non-declaratory claims only if the audit showed improprieties. *Id.* at 1159. The Ninth Circuit found this analytical approach inappropriate. Rather than searching for "overlapping facts," the question should have been whether the damages claim would be "viable without the declaratory claim." *Id.*

Here, with respect to the CEQA claims, the FAC does seek a declaratory judgment that the Board violated CEQA in its approval and adoption of the Amended Plan and Final SED. FAC at 20. But, the FAC also seeks preliminary and permanent injunctive relief that would prohibit the Board from taking any action to implement and/or enforce the Amended Plan unless and until the Board complies with CEQA. *Id.* In the alternative, the FAC seeks a mandamus writ directing the board to vacate and set aside its Final SED, suspend all activity under the Amended Plan and/or Final SED until the Board has complied with CEQA, and prepare and circulate a legally adequate SED or otherwise comply with CEQA in any subsequent action taken to approve the Amended Plan. *Id.* The injunctive and mandamus relief requested is not contingent upon the Court issuing a favorable declaration under the DJA. The Ninth Circuit has indicated in *Vasquez v. Rackauckas*, 734 F.3d 1025, 1040 (9th Cir. 2013), that the presence of a claim for injunctive relief is "independent" of a claim for declaratory relief. In *Vasquez,*

the plaintiffs sought injunctive and declaratory relief in connection with their federal procedural due process claims. *See id*. 1035, 1039-40. The defendants argued that, despite the presence of a prayer for injunctive relief, the case was subject to *Brillhart* abstention because injunctive relief would be predicated on an initial declaration that plaintiffs suffered a violation of their constitutional rights. *Id*. at 1040. The Ninth Circuit disagreed, finding the claim for injunctive relief to be "independent" of the claim for declaratory relief because "it would be viable without the declaratory claim." *Id*. Other Ninth Circuit cases have clarified this analysis by pointing out how courts should <u>not</u> approach this issue. For example, in *United National Insurance Co. v. R&D Latex Corp*., 242 F.3d 1102, 1108-09, 1112 (9th Cir. 2001), the district court declined to exercise jurisdiction over case involving a request for a declaratory judgment on an insurer's duty to defend, even though the insurer had also filed a counterclaim for reimbursement. The Ninth Circuit noted that "[i]t appears the district court believed that, for purposes of this analysis, two claims are 'independent of' one another only if one can be resolved without disposing of the legal issues raised in the other." *Id*. at 1112. "The proper analysis," according to the Ninth Circuit, is whether the non-declaratory claim is "independent in the sense that it could be litigated in federal court even if no declaratory claim had been filed." *Id*. at 1113.[2]

This reasoning seals the deal here. The request for injunctive relief against implementation of the Amended Plan until the Board complies with CEQA is no more contingent upon the declaratory relief than was the injunctive relief claim in *Vasquez*. In other words, the request for injunctive relief in the CEQA claims could be litigated even if no declaratory claim had been filed. No doubt, the issuance of injunctive relief requiring compliance with CEQA would require a finding that the Board violated CEQA, but *Vasquez* makes it clear that this is not dispositive.

Moreover, a Court has statutory authority under CEQA to require a public agency to void its

---

[2] Although *United National* did not concern *Brillhart* abstention directly, it applied a relevant independence analysis, as demonstrated by the fact that *United National* was cited with approval for its independence reasoning in *Scotts*' *Brillhart* analysis. *See Scotts*, 688 F.3d at 1159.

decision, suspend project activities, or take specific action as may be required to bring the agency into compliance with CEQA. Cal. Pub. Res. Code § 21168.9; *see, e.g.*, *Seirra Club v. Tahoe Reg'l Planning Agency*, 916 F. Supp. 2d 1098, 1160 (E.D. Cal. 2013) (district court re-affirming its prior order under CEQA to require revision of a CEQA document as a remedy). Here, the alternative remedies requested in the CEQA claim are supported by statutory authority and do not depend on the issuance of declaratory relief.

The United States' seeks both a declaratory judgment and preliminary and permanent injunctive relief in connection with its fourth claim based upon the IGI doctrine. FAC at 20-21. *Vasquez* controls as to that claim as well because the injunctive relief claim could be litigated in federal court even if the declaratory judgment claim did not exist. Even assuming, *arguendo*, that the IGI doctrine claim sought only declaratory relief, it would be of no moment to the applicability of *Brillhart*, because "[w]hen other claims are joined with an action for declaratory relief . . . , the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998).

The Board does not even attempt to address the above authorities in its reply. For all these reasons, the Court finds that *Brillhart* abstention does not apply to this case and declines to address the other *Brillhart* factors.

## 2. ***Burford***

Defendants also contend abstention is appropriate here under *Burford v. Sun Oil Co.*, 319 U.S. 315, 317-18 (1943). Under that doctrine, federal courts vested with jurisdiction may nonetheless "decline to rule on an essentially local issue arising out of a complicated state regulatory scheme." *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 376 (9th Cir. 1982) (citations omitted). Application of *Burford* generally requires:

> first, that the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court; second, that federal issues could not be separated easily from complex state law issues with respect to

which state courts might have special competence; and third, that federal review might disrupt state efforts to establish a coherent policy.

*Id.* at 377.

The Supreme Court has not "provide[d] a formulaic test for determining when dismissal under *Burford* is appropriate," but it has made it clear that "*Burford* represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" *Quackenbush v. Allstate*, 517 U.S.706, 727-28 (2011). While district courts may abstain to avoid interfering with complex state administrative processes, abstention is not required "whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv. Inc., v. Council for New Orleans*, 491 U.S. 350, 362 (1989). Moreover, a district court cannot abstain merely because there are complex and difficult issues of state law involved in the controversy before it. *City of Tucson v. U.S. W. Commc'ns, Inc.,* 284 F.3d 1128, 1133 (9th Cir. 2002) (citing *Meredith v. Winter Haven*, 320 U.S. 228, 236 (1943)).

The Board points out, correctly, that the Bay Delta Plan Amendments involve difficult questions of state law that touch on important public policy issues to the State of California. This is indisputable. The issues covered in the Bay Delta Plan Amendments are vast and complex and represent the Board's attempt to balance the needs of an ecosystem in ecological crisis against the critical resource demands placed upon that ecosystem. *See* RJN, Ex. 1 at ES-1.

The Board next points out that *Burford* abstention "is concerned with protecting complex state administrative processes from undue federal interference," *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671 (9th Cir. 2004) (internal quotation marks and citation omitted). The Board notes, again correctly, that California has engaged in a concerted effort to implement a coherent policy in the Bay-Delta. See ECF N. 17 at 17. However, the Board mis-steps by arguing that "[t]he legal issues related to such an important state policy necessitate coordinated resolution in state court." *Id.* Perhaps they do, but this does not mean, *ipso facto*, that California has concentrated resolution of those issues in a particular court

11

with special competence, as is required by *Burford*. There is no evidence in the record (or any legal

authority of which the Court is aware) that suggests California has concentrated Bay-Delta litigation in a

particular state court. The fact that various Bay-Delta Plans and amendments to those plans have been in

a state of constant litigation since the late 1970s does not satisfy *Burford*'s requirement that the state

deliberately concentrate such cases in a specialized court.

To make the requisite showing, the Board diverts discussion to issues related to the CEQA

process. Normally, CEQA requires California public agencies to conduct an environmental review of

discretionary projects they carry out or approve, and to prepare an Environmental Impact Report

("EIR") for any project that may have a significant effect on the environment. Cal. Pub. Res. Code §§

21151, 21100, 21080; *see also AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 988

(E.D. Cal. 2018) (summarizing same). CEQA also provides for an alternative pathway. Where a

regulatory program of a state agency requires a plan or other documentation containing information

similar to that required in the Environmental Impact Report ("EIR") normally required under CEQA,

that plan or other document may be submitted in lieu of an EIR, so long as the Secretary of the

California Natural Resources Agency has certified the respective regulatory program as compliant. Cal.

Pub. Res. Code § 21080.5. The Board's program of promulgating Water Quality Control Plans such as

the Bay Delta Plan has achieved the requisite certification, 14 Cal. Code Regs. § 15251(g), and the

Board has promulgated special procedures by which Substitute Environmental Documentation ("SEDs")

for those Plans must be adopted. 23 Cal. Code Regs. §§ 3775, *et seq*.

But, a central element of *Burford* abstention is whether "the state has chosen to concentrate suits

challenging the actions of the agency involved in a particular court." *Knudsen*, 676 F.2d at 376.

California provides for special treatment of CEQA cases generally. Indeed, California has made

available some special judicial mechanisms to adjudicate CEQA matters. Specifically, California Public

Resources Code § 21167.1(b) provides:

To ensure that actions or proceedings brought pursuant to [CEQA] may be

quickly heard and determined in the lower courts, the superior courts in all counties with a population of more than 200,000 shall designate one or more judges to develop expertise in this division and related land use and environmental laws, so that those judges will be available to hear, and quickly resolve, actions or proceedings brought pursuant to [CEQA].

Relying in part on this statute, at least one district court in California has applied *Burford* abstention to CEQA claims when those claims overlapped with another body of locally-important law. *See, e.g.*, *Emeryville Redevelopment Agency v. Clear Channel Outdoor*, No. C 06-01279 WHA, 2006 WL 1390561, at *4-5 (N.D. Cal. May 22, 2006) (CEQA claim qualified for *Burford* abstention because "California has put into place a specialized procedure to quickly and consistently resolve issues involving land use and the environment"); *see also Coal. for Clean Air v. VWR Int'l, LLC*, 922 F. Supp. 2d 1089, 1108 (E.D. Cal. 2013) (the undersigned finding that "California has adopted a comprehensive scheme for suits brought under CEQA" because "California concentrates suits brought under CEQA before specially designated judges with specialized expertise in the statute, and that special procedures apply, including shortened statutes of limitations, fast-tracked case management, and limited appellate review," but declining to apply *Burford* because the state and federal claims at issue did not turn on an interpretation of CEQA).

However, while California has implemented legislation that permits CEQA cases to be concentrated before judges with experience in the statute, judicially noticeable docket entries in the United States' parallel state lawsuit (that post-date the pending motion to dismiss) suggest the state matter was recently transferred from a judge designated as a CEQA specialist under California Public Resources Code § 21167.1(b) to one who is not (at least not publicly) so designated.[3] Because it is

---

[3] *See* Sacramento Cty. Sup. Court Case No. 34-2019-80003111-CU-WM-GDS, Docket No. 21 (indicating that the case had been reassigned from Department 27 to Department 18); *compare* Sacramento County Superior Court 2019 Civil Judicial Assignments, *available at* https://www.saccourt.ca.gov/civil/docs/cv-2019-judicial-assignments.pdf (last visited November 4, 2019) (indicating that Department 27 is designated to handle CEQA cases) *with* Sacramento County Superior Court Phone Directory-Judicial, *available at* https://www.saccourt.ca.gov/general/judicial-phone.aspx (last visited November 29, 2019) (indicating that Department 18 is designated to handle "Trial/ Civil Harassment TROs/ Fee Waivers (Back-up)/ Misdemeanor Warrants").

decidedly unclear whether the parallel state lawsuits are actually being handled by a judge designated under California Public Resources Code § 21167.1(b) as a CEQA specialist, the Court afforded the parties a brief opportunity to supplement the record to explain their positions as to how this development impacts the Burford analysis. ECF No. 25. Supplemental briefs were filed November 12 and November 15, 2019, respectively. ECF Nos. 26-27.

Having received and reviewed the supplemental briefs, the Court is still unconvinced that the second *Burford* element is established here. While California law certainly embodies a general policy to allow individual superior courts to assign CEQA cases to judges with experience under CEQA, such a procedure is not required. It appears, as the United States points out, ECF No. 27 at 2, that superior courts in California approach the matter differently. Yolo County has no CEQA judges. *See* Judicial Assignments, *available at* https://www.yolo.courts.ca.gov/general-info/judicial-assignments (last visited Nov. 18, 2019). Other courts require that CEQA cases be assigned to CEQA judges. *E.g.*, San Mateo Sup. Ct. Local Rule 2.1.3, *available at* http://www.sanmateocourt.org/documents/local_rules/ localrules.pdf (last visited November 29, 2019). Sacramento County currently has four departments assigned to hear CEQA cases, but that court's local rules to not require that CEQA cases be assigned to those departments. *See* Sacramento Sup. Ct. Local Rules, *available at* https://www.saccourt.ca.gov/ local-rules/docs/local-rules.pdf (last visited November 29, 2019). The procedural history of this case bears this out. As mentioned, the superior court judge currently assigned to handle the United States' state court matter is not a designated CEQA judge nor does it appear that she has, in at least the past six years, been assigned to a department designated to hear CEQA cases. Rather, Judge Eurie is currently assigned to Department 18, which handles "trial, civil harassment TROs, fee waivers (back up)." *See supra* note 3. Since 2010, Judge Eurie has also served as a presiding judge of the Sacramento County Superior Court's juvenile court. *See* Judge Stacy Boulware Eurie Profile, *available at* https://www.courts.ca.gov/34605.htm (last visited November 29, 2019).

This all causes the Court to seriously question whether California's process for handling CEQA

14

cases satisfies *Burford*'s first element, particularly under the facts and circumstances presented here. In *Burford* itself, challenges to orders from the Texas Railroad Commission were channeled by state law into a particular Texas state court (the district court for Travis County) so as to permit that court to acquire specialized knowledge useful for shaping and interpreting relevant policy. *See Burford*, 319 U.S. at 326-27; *see also United States v. Morros*, 268 F.3d 695, 705 (9th Cir. 2001) (suggesting *Burford* abstention is appropriate where there is "symbiotic relationship" between the state courts the respective administrative agency); *but see Fireman's Fund Ins. Co. v. Quackenbush*, 87 F.3d 290, 297 (9th Cir. 1996) (Ninth Circuit apparently concluding that second *Burford* element is satisfied because set of cases were consolidated before a single judge in the Los Angeles Superior Court). Here, the various superior courts handle CEQA cases in different ways, and the Sacramento County Superior Court has not treated the numerous parallel state cases in any manner that suggests (or is designed to foster) an ongoing symbiotic relationship between that court and the Board.

This is so even though the Board has developed special procedures to comply with CEQA. The State Water Board's internal procedures cannot satisfy *Burford*'s first element. *See BNSF Ry. Co. v. Feit*, No. CV 10-54-H-DWM, 2011 WL 1565796, at *3 (D. Mont. Apr. 25, 2011) ("Because the effort to create consistent policy is demonstrated in the state's efforts in controlling the review of the agency decision, an argument that the agency is a specialized court does not satisfy the Ninth Circuit requirement that review be consolidated in a particular court.").

The second *Burford* element – whether the federal issue can be separated easily from complex state law issues – does not obviously demand application of *Burford* abstention either.[4] As mentioned,

---

[4] If the United States were not a plaintiff and no federal claim remained in this case, *Burford* would not even be an issue. While the Court might exercise supplemental jurisdiction over any remaining state law claims, it would be unlikely to do so where so many parallel state lawsuits exist. Here, however, the United States' role as the plaintiff provides a basis for this Court's jurisdiction even in the absence of a federal claim. This is, in part, why it is unclear whether *Burford* or any of the related abstention doctrines discussed herein even apply where the United States is a plaintiff. Whether abstention is appropriate where the federal government seeks to invoke jurisdiction under 28 U.S.C. § 1345 is an issue left unresolved by the United States Supreme Court, *see Colorado River*, 424 U.S. at 816 n. 23. One district court astutely noted that abstention doctrines are "designed to minimize unnecessary friction between federal and state courts," but whether a court "abstain[s], leaving the United States to request intervention in the state court action, or [ ] entertain[s] the government's complaint,

15

the FAC includes a claim alleging that the Amended Plan violates the IGI Doctrine, FAC ¶¶ 83-94, which is, in turn, grounded in the Supremacy Clause of the United States Constitution, *see Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014); *City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). As mentioned, among other things, the Amended Plan recognizes that the existing salinity objective is "lower than what is needed to reasonably protect agricultural beneficial uses." FAC ¶ 44 (citing State Water Board Resolution No 2018-059, ¶ 6). Prior to the Plan Amendment, the Bay-Delta Plan required 1.0 dS/m September through March and 0.7 dS/m April through August. FAC ¶ 46. Currently, Reclamation's water rights for the New Melones Project are conditioned, through Water Right Decision 1641 (D-1641), on meeting 1.0 dS/m, September through March, and 0.7 dS/m April through August on the San Joaquin River at Vernalis. FAC ¶ 48. These standards are met through releases of water from New Melones and related reservoirs when necessary to create dilution flows. *Id*.

The FAC alleges:

> 53.     The program of implementation [for the above-mentioned new standards] is analyzed in the Board's SED as assigning solely to Reclamation a burden of providing dilution flows to meet a lower salinity level than 1.0 dS/m (which level the Board otherwise finds protective of Southern Delta agricultural uses). The SED describes its analysis that "USBR would also continue to be required to maintain a salinity of 0.7 dS/m, April through August at Vernalis, as a condition of their water right, in order to implement and meet the proposed salinity water quality objectives in the interior southern Delta." SED, Executive Summary, p. ES-5.

> 54.     In the SED, the Board further prejudices any future water right implementation process by explaining that Reclamation would be required to meet the 0.7 dS/m at Vernalis (despite the actual standard being 1.0 dS/m) to provide "assimilative capacity" below Vernalis so that other water users and dischargers may degrade the salinity level below Vernalis. Id.

---

friction between federal-state relations is inevitable." *United States v. Vill. of Palatine, Ill*., 845 F. Supp. 540, 543 (N.D. Ill. 1993).

16

In sum, the United States alleges that "because the Board has now determined that a standard of 1.0 dS/m is sufficiently protective of agricultural beneficial uses, there is no rational basis for the Board to require Reclamation to meet a more stringent standard to prevent unacceptable water quality at Vernalis." FAC ¶ 90.

The Court agrees with Plaintiff that the IGI claim can be separated from the CEQA claim. While the IGI claim will require review of the substance of the Amended Plan to determine whether the salinity requirement unlawfully discriminates against the federal government, the United States' CEQA claims turn on the distinct legal questions(s) of whether the methods employed by the Board to evaluate the environmental impacts of the Amended Plan comport with CEQA's requirements.

The Board's argument in support of a finding the IGI and CEQA claims are "intertwined" is cursory at best. While acknowledging that the claims have different legal bases, the Board argues the alleged discrimination in the IGI claim "involves the amendments to the salinity objective and Reclamation's existing permit conditions, issues that are also present in the coordinated cases." ECF No 17 at 18. The Board simply has not met its burden[5] to demonstrate *Burford* abstention is appropriate.

Finally, the Board points out that the state petition filed by Stockton East Water District ("Stockton East") alleges that the Board acted unlawfully by imposing permit conditions on Reclamation exceeding the water quality standards. *See* RJN, Ex. 13, Verified Petition for Writ of Mandate, Complaint for Declaratory and Injunctive Relief in *Stockton East Water District v. California State Water Resources Control Board, et al.*, (San Joaquin Cnty. Sup. Ct. Case No. STKCV-UWM-2019-472 [filed January 11, 2019]) ¶¶ 140-44. Specifically, Stockton East alleges that this violates a principle of California law that requires a nexus between a condition imposed in a water right permit and the harm sought to be remedied. *Id*. at ¶ 142. Not only is this not the same issue raised by the United

---

[5] *See Communications Telesystems Int'l v. California Public Utility Com'n*, 196 F.3d 1011, 1020 (9th Cir. 1999) (assigning burden to party opposing the exercise of federal jurisdiction when evaluating applicability of abstention doctrine); *see also Bart St. III v. ACC Enterprises, LLC*, No. 217CV00083GMNVCF, 2018 WL 4682318, at *7 (D. Nev. Sept. 27, 2018) (same).

States, the Board cites no authority to support the contention that a claim raised by a third party in an independent lawsuit is relevant to this element of the *Burford* analysis.

In sum, the Court declines to apply *Burford* abstention here.

### 3. *Pullman*

The Board next argues for application of *Pullman* abstention. *Pullman* abstention is appropriate only when: "(1) the federal plaintiff's complaint must require resolution of a sensitive question of federal constitutional law; (2) that question must be susceptible to being mooted or narrowed by a definitive ruling on state law issues; and (3) the possibly determinative state law must be unclear." *Morros*, 268 F.3d at 703-04.[6] Put another way, "*Pullman* holds that 'federal courts should abstain from decisions when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided. By abstaining in such cases, federal courts . . . avoid both unnecessary adjudication of federal questions and 'needless friction with state policies. . . .'" *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 802 (9th Cir. 2001) (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)). If a court abstains under *Pullman*, "retention of jurisdiction, and not dismissal of the action, is the proper course." *Id.* (citation omitted). A court is never <u>required</u> to apply *Pullman* because the doctrine does not implicate subject matter jurisdiction. *Id.* The doctrine is an "extraordinary and narrow exception" to the Court's jurisdiction, and "should rarely be applied." *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003).

Whether the FAC presents a "a sensitive question of federal constitutional law" turns on whether the IGI claim "touch[es] on a sensitive area of social policy." *Columbia Basin*, 268 F.3d at 802. Courts have found this element to be satisfied where an ordinance challenged on constitutional grounds concerned land use and maintaining habitable dwellings for residents. *Id.* Relatedly, *Pullman* has been

---

[6] The Court does not see any way that the absence of the IGI claim would warrant a stay under *Pullman*, as *Pullman* simply would not apply in the absence of that constitutionally grounded claim.

18

applied in cases involving landlord tenant issues. *See 1049 Market Street LLC v. City & Cty. of San Francisco*, No. C 15-2075 JSW, 2015 WL 5676019, at *3 (N.D. Cal. Sept. 28, 2015) (following *Columbia Basin* to hold that first *Pullman* element is satisfied by case involving landlord-tenant relationships). *Pullman* has also been applied in a case concerning a state's specific protocol for carrying out a death sentence by lethal injection. *Brown v. Vail*, 623 F. Supp. 2d 1241, 1244-45 (E.D. Wash. Mar 2, 2009). The Court agrees with the Board that the first *Pullman* element is satisfied here. The federal claim in this case is a constitutional challenge to how the Board has imposed water quality controls on the Bureau of Reclamation. Those water quality controls are closely akin to a form of land use regulation and require, among other things, a balancing of multiple beneficial uses of water. The United States' attempt to re-cast its federal claim at a high level of generality as a question of "whether the Board violated the principles of intergovernmental immunity by discriminating against Reclamation with respect to the salinity standard," ECF No. 20 at 22, ignores the entire point of *Pullman's* first element, which is to identify federal constitutional claims that overlap with or challenge state regulatory efforts in sensitive areas of social policy. The first *Pullman* requirement is satisfied.

Evaluation of the second *Pullman* element is somewhat more difficult. The second prong "is met where '[a] state law question . . . has the potential of at least altering the nature of the federal constitutional questions.'" *VH Prop. Corp. v. City of Ranchos Palos Verdes*, 622 F. Supp. 2d 958, 963 (C.D. Cal. 2009), citing *C–Y Dev. Co. v. City of Redlands*, 703 F.2d 375, 377 (9th Cir. 1983) (State adjudication need only "reduce the contours" of the litigation). The Board argues that if the state court finds in Reclamation's favor on any of the CEQA issues, the federal constitutional question "need not be addressed by this Court." ECF No 17-1 at 21. More generally, the Board argues that if any of the state court petitioners prevail, the "contours of this case will be reduced." *Id*. However, as the United States points out, the CEQA claims point out deficiencies in the Board's environmental analysis for the Amended Plan, but those claims do not raise CEQA challenges to the Board's decision to require Reclamation to adhere to the stricter salinity standard while relaxing that standard for all other parties.

*See generally* FAC.

The question is not, as the United States suggests, whether the "state law question is . . . a necessary preliminary to reaching the federal constitutional question. ECF No. 20 at 22 (citing *Rancho Palos Verdes Corp. v . City of Laguna Beach*, 547 F.2d 1092, 1095 (9th Cir. 1976)). Rather, "[f]or *Pullman* purposes . . . it is sufficient if the state law issues might 'narrow' the federal constitutional questions." *Sinclair Oil Corp. v. Cty. of Santa Barbara*, 96 F.3d 401, 409 (9th Cir. 1996). "In land use cases, the Ninth Circuit has frequently found this requirement satisfied where a favorable decision on a state law claim would provide plaintiff with some or all of the relief he seeks." *VH Prop.*, 622 F. Supp. 2d at 963; *see also Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n*, No. CIV. 11-00414 SOM, 2012 WL 1109046, at *4 (D. Haw. Mar. 30, 2012). Here, although it is unclear whether success on its CEQA claim will provide the United States with "some or all" of the relief it seeks, success on the CEQA claims might result in delayed implementation of the Plan Amendments and/or the Board being required to set aside its approval of the Plan Amendments. This, in turn, might cause the Board to re think its treatment of Reclamation vis-à-vis other water users. Although the Court does not find the showing as to the second element to be overwhelming, it is sufficient. The kind of uncertainty presented here is why abstention under *Pullman* requires an abstaining court to stay claims, rather than dismiss them.

Application of the final *Pullman* element points in the opposite direction. As mentioned, "*Pullman* holds that federal courts should abstain from decisions when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Columbia Basin*, 268 F.3d at 801. The Board cites *Kollsman v. Los Angeles*, 737 F.2d 830 (9th Cir. 1984), which concerned a developer's challenge to Los Angeles' denial of a permit to develop a large subdivision. The developer filed suit in federal court alleging constitutional and state law claims. *Id.* at 832. The district court decided the state law issues, including issues arising under CEQA, without ruling on the federal constitutional claims. *Id.* at 831-33. The Ninth Circuit reversed, finding that the district

court abused its discretion by not applying *Pullman* discretion. *Id*. at 836. In particular, the Ninth Circuit noted that the resolution of the state law questions required a balancing of various policies, including those applicable to approving development projects as well as CEQA. *Id*. at 836-37; *see also id.* at 834 ("this case requires attention not only to Chapter 4.5 of the California Government Code, the focus of the district court's opinion, but also consideration of the interrelation of that chapter with the Subdivision Map Act and the California Environmental Quality Act").

The Board is correct that the Bay-Delta Plan Amendments "contain novel and controversial elements and regulate certain tributaries for the first time." ECF No. 17-1 at 22. The Board goes on to assert that "[t]hese recently enacted regulations are designed to address long-term environmental issues in the Bay-Delta and will need to be interpreted in light of competing state policies, CEQA, and the California Water Code," in an effort to argue that "[t]here is significant uncertainty about the resolution of dozens of important state law issues raised by these cases." *Id*. But, the Board makes no effort to support this latter assertion with any specifics. The Court's own examination of the CEQA claims raised by Federal Defendants reveals the following claims:

(1) The Board violated CEQA because its project description is inconsistent with the project it analyzed. FAC ¶ 61. Specifically, the project description lacks any discussion of reservoir controls imposed upon New Melones in the form of carryover storage targets, even though the environmental analyses included in the CEQA document include such reservoir controls. *Id*. ¶ 62. In addition, the United States asserts that the Board violated CEQA to the extent it failed to explain in the project description that the carryover storage targets and reservoir controls were mitigation measures and not part of the project itself. *Id* ¶ 65.

(2) The Board violated CEQA by unlawfully compressing the analysis of impacts and mitigation measures, specifically with regard to carryover storage targets, in violation of *Lotus v. Department of*

*Transportation*, 167 Cal. Rptr. 3d 382, 388, 391 (Cal. Dist. Ct. App. 2014). FAC ¶ 69.[7] As a result of this error, the United States alleges that it is "impossible for Reclamation and the public to determine the true impact of the Amended Plan, including on river temperatures and related water quality conditions, water supply reliability, flood control and power operations, as well as on recreation at New Melones." *Id* ¶ 73.

(3) Relatedly, the United States alleges that the Board violated CEQA by failing to evaluate the Amended Plan's impacts on the New Melones project. *Id* ¶ 76. "According to the Board's technical analysis, the Amended Plan does not result in detrimental impacts on water temperatures in the tributaries and on the mainstem of the San Joaquin River. But that analysis is fundamentally flawed, because the Board incorporated carryover storage and other reservoir controls, i.e., mitigation measures, into its modeling. Doing so reserved hundreds of thousands of acre feet of water in reservoir storage at New Melones that may otherwise have been used for New Melones Project purposes, and serves to mask the true impacts of the Amended Plan on stream temperatures and related water quality conditions." *Id* ¶ 77

Apart from general explanations of "complexity," the Board has not explained how these issues are "unsettled" in any way other than that no court has yet to apply CEQA precedent to the exact facts of this case. This is a function federal courts perform in connection with state law claims on a regular basis, whether the fact patterns are simple or complex. The Court declines to apply *Pullman* abstention here.

**4.    *Colorado River***

This brings the Court to the final "abstention"[8] doctrine: *Colorado River Water Conservation*

_____

[7] This Court recently decided a CEQA case involving the application of *Lotus* to a complex water project. *AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1007 (E.D. Cal. 2018), *appeal dismissed sub nom. AquAlliance v. United States Bureau of Reclamation*, No. 18-16666, 2019 WL 4199912 (9th Cir. June 25, 2019). Although the Court did have to apply *Lotus* to new facts, the applicable legal framework does not appear to be "unsettled."

[8] In *Colorado River*, the Supreme Court indicated that the facts of that case fell "within none of the abstention categories," but instead applied principles resting on judicial administration considerations. 424 U.S. at 817. Thus, "the *Colorado River* doctrine is a form of deference to state court jurisdiction and not a form of abstention." *Coopers & Lybrand v. Sun-Diamond Growers of CA*, 912 F.2d 1135, 1137 (9th Cir. 1990) (internal quotation marks and citation omitted).

*District v. United States*, 424 U.S. 800 (1976). In *Colorado River* the federal government sued certain

Colorado water users in federal court, seeking a declaration of water rights in certain waterways in

Colorado. 424 U.S. at 805. The case was filed against the backdrop of ongoing state water rights

adjudication proceedings, in which Colorado had previously established seven water districts. *Id*. at 804.

After the United States filed its federal lawsuit, several of the defendants in that case filed an application

to join the federal government as a party to the state court adjudication proceedings. *Id*. at 806. The

district court dismissed the federal suit on abstention grounds in deference to ongoing state court

proceedings. *Id*. The Tenth Circuit reversed. *Id*.

The Supreme Court reasoned that considerations of "wise judicial administration, giving regard

to conservation of judicial resources and comprehensive disposition of litigation" may counsel in favor

of granting a stay when there are concurrent state proceedings involving the same matter as in the

federal district court. *Id*. at 817. "The Supreme Court has stressed, however, that the *Colorado River*

exception to 'the virtually unflagging obligation of the federal courts to exercise the jurisdiction given

them' is a narrow one." *Intel Corp. v. Advanced Micro Devices, Inc.,* 12 F.3d 908, 912 (9th Cir. 1993)

(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 17 (1983)). "Only

exceptional circumstances justify such a stay, and whether these circumstances exist is determined by

weighing a complex of factors." *Id.* (citing *Moses H. Cone,* 460 U.S. at 23-26).

Drawing from *Colorado River, Moses H. Cone* and subsequent cases, the Ninth Circuit has

recognized eight factors for assessing the appropriateness of a *Colorado River* stay or dismissal:

(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal

forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained

jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether

the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to

avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the

federal court. *R.R. St. & Co.,* 656 F.3d at 978-79 (footnotes omitted); *see also Seneca*, 862 F.3d at 841-

42.

"These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a mechanical checklist." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.,* 843 F.2d 1253, 1257 (9th Cir. 1988). The factors are "not a mechanical checklist; indeed, some may not have any applicability to a case." *Seneca,* 862 F.3d at 842 (internal citation omitted). Yet, "[a]ny doubt as to whether a factor exists should be resolved against a stay." *Travelers Indem. Co. v. Madonna,* 914 F.2d 1364, 1369 (9th Cir. 1990). Although a court may either stay or dismiss a case or claims under *Colorado River,* the Ninth Circuit generally requires a stay rather than a dismissal. *R.R. St. & Co.,* 656 F.3d at 978 n. 8.

The Ninth Circuit has not addressed the propriety of issuing a partial *Colorado River* stay, but district courts in the Ninth Circuit found partial stays permissible, "where some, but not all, of a federal plaintiff's claims are pending in a parallel state action." *Krieger v. Atheros Comm'cs, Inc.,*776 F. Supp. 2d 1053 1060-61 (N.D. Cal. 2011) (staying state law class action claims while permitting federal securities law claims to proceed); *see also Taylor v. AlliedBarton Sec. Servs. LP,* No. 13–CV–01613–AWI, 2014 WL 1329415, *5 n. 6 (E.D. Cal. Apr. 1, 2014) (observing that "[c]ourts in the Ninth Circuit have [ ] held that a partial stay of proceedings is authorized under the *Colorado River* doctrine," and staying state law claims while permitting a Fair Labor Standards Act claim to proceed); *In re Countrywide Fin. Corp. Derivative Litig.,* 542 F. Supp. 2d 1160, 1172 (C.D. Cal. 2008) (concluding that a partial stay of state law claims raised in both state and federal proceedings are under *Colorado River* was permissible, and permitting a federal securities law claim to go forward); *Daugherty v. Oppenheimer & Co.,* No. CV 06–7725 PJH, 2007 WL 1994187, *6 (N.D. Cal. July 5, 2007) (staying only duplicative claims, reasoning that "*Colorado River* applies even where a state court action will not resolve all the claims in the federal action."); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 56 F. Supp. 3d 1121, 1146-47 (C.D. Cal. 2014) (collecting cases and staying state law contract claims while permitting federal securities claim to proceed).

The first *Colorado River* factor – which court first assumed jurisdiction over any *res* – is irrelevant here. There is no property in dispute, at least not directly. (As discussed below, *Colorado River* itself discusses how water rights are in many ways property rights. To the extent this is relevant here, the Court takes that into consideration as part of the piecemeal litigation factor.)

As to the second factor – relative convenience of each forum – the Board asserts that Sacramento is more convenient than Fresno for the parties and Counsel. The Board is represented by California Deputy Attorney Generals based in Oakland, California, while the United States is represented by Department of Justice personnel from both Denver, Colorado, and Sacramento, California, with the laboring oar of litigation thus far being pulled by counsel from Denver. Considering those facts, coupled with the reality that Court appearances are likely to be few and far between, the Court does not believe Sacramento is so much more convenient for the parties as to make any significant difference in the calculus here.

The Court likewise does not believe the fourth factor weighs materially in either direction. The United States filed its cases simultaneously in federal and state court. The Board suggests that the earlier filing of the other eleven state court CEQA actions somehow means that "proceedings were first initiated in state court," ECF No. 17-1 at 20, but offers no support for that proposition.

Nor does the Court believe the seventh factor – the desire to avoid forum shopping – is applicable here. The Board argues that by filing in both state and federal court, the United states is actively forum shopping because (1) the state court filing acknowledges that state court is an appropriate forum for the claims filed there; and (2) the addition of the IGI claim in the federal case after the Board moved to dismiss in this Court "strikes of procedural maneuvering." *Id.* at 12. The Court does not agree. The United States openly stated its preference for the federal forum and explained in its complaint that it was simultaneously filing a state petition "out of an abundance of caution in the event that, for any reason, this action is not adjudicated on the merits in this Court and to ensure that the state statute of limitations was scrupulously complied with." FAC at 6 n. 3. The Court has no reason to question the

truth of this statement/representation.

As to the remaining factors, the results are split according to the nature of the claims in question. As to the IGI claim, there is no threat of piecemeal litigation, because no IGI claim has been joined in the state forum. Likewise, federal law provides the rule of decision on the merits of the IGI claim. While the Amended Plan, which provides the factual backdrop for the IGI claim, is a creature of state law, there is no indication that resolution of the IGI claim would turn on an interpretation of state law or policy. (The Court notes that IGI claim, by its very nature, involves consideration of the impact of state laws and regulations on the federal government.) The parties do not address in any substantive way whether they believe the IGI claim could be brought and litigated in the state court. Even assuming this factor did weigh in favor of abstention, it would be the only one.

The story is dramatically different for the CEQA claims. Allowing the United States' CEQA claims to proceed in this case, while at least eleven parallel CEQA cases proceed in state court, would be a colossal waste of judicial resources. This would be so even if the United States prevails on its own motion to stay its state court action. The claims raised by the United States closely parallel those raised in the eleven other cases,[9] and there is no suggestion from any party that the state court is or would ever consider staying its eleven CEQA cases in favor of allowing this one to proceed. The Court believes this factor alone warrants application of *Colorado River* to stay the CEQA claims in this case.

The remaining *Colorado River* factors also stack up in favor of abstention as to the CEQA claims. State law indisputably provides the rules of decision for and the state court is fully equipped to adjudicate those claims.

The United States' attempts to avoid application of *Colorado River* any of its claims by arguing that *Colorado River* should be narrowly confined to its facts. The United states points to language in

---

[9] Some cases indicate that a threshold question must be asked before applying the Colorado River doctrine: whether the state and federal actions are substantially similar. *Goodin v. Vendley*, 356 F. Supp. 3d 935, 944 (N.D. Cal. 2018). This requirement is satisfied as to the CEQA claims, which are largely identical to and effectively overlap with CEQA claims brought in the various state court CEQA actions.

*Colorado River* indicating that, although the Supreme Court believed "a number of factors clearly counsel[ed] against concurrent federal proceedings" in that case, the "most important factor" was the McCarran Amendment. *Colorado River*, 424 U.S. at 819. The McCarran Amendment, 66 Stat. 560, 43 U.S.C. s 666, provides that "consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit." The Supreme Court reasoned that "[t]he clear federal policy evinced by that legislation is the avoidance of piecemeal adjudication of water rights in a river system." *Id.* at 819. The Court's reasoning continues:

> This policy is akin to that underlying the rule requiring that jurisdiction be yielded to the court first acquiring control of property, for the concern in such instances is with avoiding the generation of additional litigation through permitting inconsistent dispositions of property. This concern is heightened with respect to water rights, the relationships among which are highly interdependent. Indeed, we have recognized that actions seeking the allocation of water essentially involve the disposition of property and are best conducted in unified proceedings. The consent to jurisdiction given by the McCarran Amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals.

*Id.* The United States argues that this reasoning is inapplicable here because "the McCarran Amendment is confined to suits for general adjudication of water rights and is not implicated by the Board's decision to approve the Amended Plan challenged in this case." ECF No. 20 at 19. This misses the forest for the trees. It is true that the CEQA claims do not implicate a general adjudication of water rights, but this does not mean Colorado River is restricted to just such cases. As the Board outlines in reply, *Colorado River* has been applied in a wide variety of cases. ECF No. 21 at 3-4 (citing *R.R. Street*, 656 F.3d 966 (insurance coverage dispute regarding dry cleaning contamination); *Seven Arts Pictures v. Fireworks Entm't,* 244 Fed. Appx. 836, 838 (9th Cir. 2007) (copyright case); *Beck v. California*, 479 F. Supp. 392, 398-99 (C.D. Cal. 1979) (challenge to Coastal Commission denial of construction permit); *Wentz v.*

*Taco Bell Corp.*, 12-cv-1813 LJO, 2012 WL 6021367, *6 (E.D. Cal. Dec. 4, 2012) (O'Neill, J.) (labor dispute)).

The danger of wasteful piecemeal litigation here is real and it is powerful. The Court will stay[10] the CEQA claims in this case until further notice.

## C. Challenges to Intergovernmental Immunity Claim

### 1. Ripeness

The Board argues that the IGI claim is not ripe because "the board has not yet assigned responsibility for meeting the revised salinity objective." ECF No. 17 at 3. The Court notes at the outset, that the non-abstention grounds for dismissal advanced in the Board's brief are not well developed, taking up a total of approximately three pages in the opening brief, three pages in the opposition, and a single page in the reply. Only a small portion of even that limited briefing is dedicated to the jurisdictional issue of ripeness. Nonetheless, the Court has a *sua sponte* obligation to evaluate its own jurisdiction before reaching the merits of a claim. *Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006).

Ripeness is "peculiarly a question of timing," *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974), designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993). "[T]he ripeness inquiry contains both a constitutional and a prudential component." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (internal quotation marks and citations omitted). "The

---

[10] The Ninth Circuit has held that a district court should stay, rather than dismiss, claims under *Colorado River* to ensure that "the federal forum will remain open if for some unexpected reason the state forum does turn out to be inadequate." *Coopers & Lybrand*, 912 F.2d at 1138 (internal quotation marks and citation omitted); *see also Goodin v. Vendley*, 356 F. Supp. 3d 935, 943 (N.D. Cal. 2018).

constitutional component focuses on whether there is sufficient injury, and thus is closely tied to the standing requirement; the prudential component, on the other hand, focuses on whether there is an adequate record upon which to base effective review." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 902-03 (9th Cir. 1993) (internal citation omitted). "The party asserting federal jurisdiction bears the burden of proving the case is properly in federal court.*" In re Ford Motor Co./Citibank (S.D.), N.A.*, 264 F.3d 952, 957 (9th Cir. 2001).

A "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Where a dispute hangs on future contingencies that may or may not occur, it may be too impermissibly speculative to present a justiciable controversy." *Davis v. Guam*, 785 F.3d 1311, 1318 (9th Cir. 2015) (internal quotation marks and citations omitted). In deciding whether an agency decision is ripe, a court should generally examine "the fitness of the particular issues for judicial decision and the hardship to the parties of withholding review." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

*Ohio Forestry* concerned a challenge to a federal Forest Plan that allegedly permitted excessive logging and clear cutting in violation of the National Forest Management Act of 1976. *Id*. at 729. However, the plan itself did not authorize the cutting of any trees. *Id*. Rather, before any harvesting could take place, among other things, specific plans must be drawn up (including specific information as to location and harvesting methods), site-specific environmental analyses must be performed, and the Forest Service must ensure the project is consistent with the Forest Plan. *Id*. at 730. The Supreme Court held that challenges to the Forest Plan should await site-specific implementation of the plan where: (1) there would be no hardship to the plaintiff, (2) judicial review would inappropriately interfere with further administrative action, and (3) the court would benefit from additional factual development of the issues. *Id*. at 733. Applying these factors, the Supreme Court held that delaying review would not cause the plaintiffs significant hardship because the challenged Plan provisions "do not create adverse effects

of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm." *Id*. More specifically,

> they do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut.

*Id. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003) (applying same rule).

As for practical harm, the Supreme Court held that, given the procedural steps that must take place before logging can occur, the plaintiff had "ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry,* 523 U.S at 734. From the agency's perspective, "immediate judicial review directed at the lawfulness of logging and clearcutting could hinder agency efforts to refine its policies." *Id.* at 735.

Finally, with respect to the third factor – whether the court would benefit from additional factual development of the issues – the Court reasoned that resolution of the claims in question would require time-consuming review of how a technical plan would impact many different parcels of land," and concluded that further factual development would "significantly advance" the Court's ability to deal with the issues presented. *Id*. at 736-37.

Here, as mentioned, it is the Board's position that the IGI claim is not ripe because "the board has not yet assigned responsibility for meeting the revised salinity objective." ECF No. 17 at 22. The Board maintains that the Bay-Delta Plan Amendments are not self-executing, *see id.* at 3, because the Board will implement the Amended Plan through future water rights and water quality actions. *Id*. at 22. In support of this proposition, the Board cites the Amended Plan itself, which states that "[b]y 2022, the State Water Board will fully implement the February through June LSJR flow objectives through water right actions or water quality actions." RJN, Ex. 3 at 24.

What is somewhat unclear from the face of the Amended Plan is whether, assuming the

Amended Plan's CEQA document survives judicial review, the Board would ever implement the objectives in the Amended Plan before all respective water rights and/or water quality actions are completed. Notwithstanding 2022 goal for "full[] implementat[ion]" of the flow objectives through water rights or water quality actions quoted above, other language in the Amended Plan suggests it is a distinct possibility that existing water right orders will be kept in place to ensure at least some of the Amended Plan's objectives are met on an interim basis. For example, in connection with the Delta Outflow Objective, the Amended plan indicates:

> The permits and license of the [the Department of Water Resources]and the USBR are conditioned to establish responsibilities to ensure that the Delta Outflow Objective is met on an interim basis until the State Water Board adopts a water right decision or order that assigns permanent responsibility for meeting the Delta Outflow Objective.

*Id.* at 23. This suggests that existing water rights holders, of which Reclamation is one, might be left "holding the bag" with respect to some aspects of implementation of the Amended Plan simply by virtue of their existing water right permit, at least until other water users are assigned a portion of the respective responsibility for meeting the objectives of the Amended Plan. *See also id.* at 24 ("It is the State Water Board's intention that an entity's implementation of the LSJR flow objectives . . . will meet any responsibility to contribute to the LSJR inflow component of the Delta outflow objective in this Plan. The State Water Board, however, may further consider and reallocate responsibility for implementing the Delta outflow objective in any subsequent proceeding, including a water right proceeding.").

The United States also appears to be suggesting that their claim is ripe now because the Amended Plan locks the Board into treating Reclamation a certain way in future proceedings. For example, as the FAC alleges, "Although the Board determined that the 1.0 dS/m limit [at Vernalis] is protective of agricultural beneficial uses in the Southern Delta, it requires Reclamation to meet a lower salinity limit of 0.7 dS/m from April through August. The Amended Plan imposes these requirements on Reclamation alone at Vernalis, and not on the State of California's own citizens or on any other

persons." FAC ¶ 85. It is further alleged that "[w]hile the imposition of these requirements on Reclamation will be formalized in a subsequent adjudicatory water rights proceeding, that proceeding[] must comply with the Plan Amendments, and therefore the adjudicatory water rights proceeding will necessarily impose this requirement on Reclamation. *See* Cal. Water Code § 13247." *Id.* ¶ 86.

There is record support for these allegations. While the Amended Plan is open to having others share the burden with respect to some aspects of the interior southern delta salinity objectives, RJN, Ex. 3 at 35, ¶ ii, with respect to salinity at the Vernalis compliance location, the Amended Plan is relatively clear: "[a]s part of implementing the salinity water quality objective for the interior southern Delta, USBR *shall be required* to continue to comply with these [more stringent] salinity levels, as a condition of its water rights." *Id.* at 34-35, ¶ i (emphasis added). In addition, as Reclamation points out, California Water Code § 13247 requires state boards carrying out activities that affect water quality to comply with water quality control plans, and *State Water Res. Control Bd. Cases*, 136 Cal. App. 4th 674, 730 (2006), has interpreted § 13247 to require the Board to comply with water quality control plans when issuing water rights decisions.

The Board argues that because it has yet to impose obligations on any water users under the Amended Plan, until it does so it is impossible to determine whether the releases required to meet the salinity limit will be more burdensome than releases required of other users. ECF No. 21 at 10. Under the IGI doctrine, state law can violate the Supremacy Clause if it discriminates against the federal government by "treat[ing] someone else better than it treats" the United States. *North Dakota v. United States*, 495 U.S. 423, 438 (1990). But, critically, in analyzing the constitutionality of a state law or policy prescription, "it is not appropriate to look to the most narrow provision addressing the Government or those with whom it deals." *Id.* This is because "a state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory." *Id.* In addition, even if the federal government is made worse off by a state regulatory action, that regulation can survive if "significant differences between the two classes" justify

the inconsistent burdens." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 816 (1989).

Here, the Board maintains that the Amended Plan's salinity objectives will be "implemented through a combination of measures imposed on an unknown number of water users." ECF No. 17 at 23 (citing RJN Ex. 3, at 34-35, 38). But, the pages of the record cited by the Board are, at best, vague about the time frame by which the Board plans to assign responsibility to those new water users. *See* RJN Ex. 3, at 34-35 ("As part of implementing the salinity water quality objective for the interior southern Delta, USBR shall be required to continue to comply with these salinity levels, as a condition of its water rights. Implementation of the southern Delta salinity objective at Vernalis may be modified by the State Water Board in a future Bay-Delta Plan update and a subsequent water right proceeding, if necessary, after adoption of a Total Maximum Daily Load (TMDL) or other salinity management plan by the State Water Board or Central Valley Regional Water Quality Control Board (Central Valley Regional Water Board."). If implementation of the Amended Plan is conditioned on assignment of shared responsibility, then why does the Amended Plan suggest Reclamation may be required to operate to more stringent objectives on an "interim basis"? If implementation is not so conditioned, at what point would this case become riper than now?

To make a long story short, it is impossible for the Court to tell from the sparse briefing on the ripeness issue whether the Amended Plan indeed creates "adverse effects of a strictly legal kind" and the extent to which further factual development would aid the Court's decisionmaking. The Court is not an expert in the technical matters at issue in this case. Accordingly, the Court will hold the question in abeyance pending further briefing on the issue.

### 2.    Standing

In a footnote, the Board raises the related argument that the United States lacks standing to pursue its IGI claim because it cannot "demonstrate" a concrete injury. ECF No. 17-1 at 23 n. 15. First, the question on a motion to dismiss is not whether the Plaintiff has demonstrated standing but, rather, whether it has *alleged* facts to support standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."). Briefly, to have standing, a plaintiff must first show it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560. Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id*. Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 561.

Other than to generally assert that the United States can show no "harm," the Board does not elaborate on its standing argument in any way independent of its position on ripeness. The Court believes the appropriate focus is on ripeness, not standing. As for the basic standing elements, although the FAC does not directly identify the "harm" caused by the allegedly discrimination against Reclamation in connection with the salinity objective, the obvious implication of the factual allegations of the complaint is that Reclamation is harmed by being required to release more water to provide dilution flows than it otherwise would be required to release. FAC ¶¶ 48, 52. The allegations also reasonably support a finding that it is the Amended Plan that would be the cause of any such excess releases and that this Court could provide effective relief from that harm by finding that the Amended Plan is cannot be lawfully implemented in its present form.

The crux of the Board's objection remains the issue of ripeness, which naturally merges with the question of whether harm is imminent or concrete. In "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138–39 (9th Cir. 2000). Accordingly, if there are any serious doubts about the United States' standing, those doubts merge with the ripeness issues discussed above.

### 3. **12(b)(6) Challenge to the IGI Claim.**

The Court declines to reach the other merits challenges to the IGI claim prior to resolving the question of ripeness. The Court notes that while the arguments are not facially absurd, they largely disregard the applicable pleading standard, and instead raise factual disputes more appropriate for later stages of litigation and rely on facts drawn from the record and prior cases, ECF No. 17-1 at 24:1-8; ECF No. 21 at 11:17-24, as though the court can take judicial notice of them, which it cannot, *see United States v. S. Cal. Edison Co*., 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (court may only take judicial notice of the existence of material contained in public records, not the truth of the facts contained/asserted therein); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) ("A court may take judicial notice of another court's opinion or orders, but not the truth of the facts recited therein.") . Moreover, the arguments advanced for dismissal under Rule 12(b)(6) are presented with even less thoroughness than are the jurisdictional challenges. Should the claim survive the ripeness challenge, the Court may request further briefing.

## IV. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) The Court declines to apply *Brillhart*, *Burford*, or *Pullman* abstention to any of the claims in this case;

(2) Pursuant to the *Colorado River* doctrine, the Court finds it appropriate to stay adjudication of only the CEQA claims until further notice;

//

//

//

//

//

//

(3) The parties are directed to submit a joint status report every six months, or within thirty (30) days of resolution of the parallel state court CEQA claims, whichever is sooner, updating the Court on the progress of the parallel state court proceedings;

(4) The parties are further directed to meet and confer to propose a stipulated schedule for further briefing of the remaining jurisdictional issues related to the IGI claim and shall email their proposed schedule to ljoorders@caed.uscourts.gov on or before December 12, 2019.

IT IS SO ORDERED.

Dated:    **December 2, 2019**              **/s/ Lawrence J. O'Neill**
                                            UNITED STATES CHIEF DISTRICT JUDGE