# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:19-cv-000547-JLT-EPG |
| Plaintiffs, | **ORDER GRANTING MOTION TO DISMISS INTERGOVERNMENTAL IMMUNITY CLAIM; REQUIRING SUPPLEMENTAL BRIEFING CONCERNING REMAINING STATE LAW CLAIMS** |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD & STATE WATER RESOURCES CONTROL BOARD CHAIR E. JOAQUIN ESOUIVEL, in his official capacity, | |
| | (Doc. 17, 60, 61) |
| Defendants. | ***30 DAY DEADLINE*** |

## I.  INTRODUCTION

The United States of America, on behalf of the United States Department of the Interior through its Bureau of Reclamation, filed two similar lawsuits, one in Sacramento County Superior Court, the other in this Court, concerning amendments adopted by Defendant State Water Resources Control Board ("State Board" or "the Board") to the Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary ("Bay-Delta Plan Amendments," "Amendments," or "Amended Plan")[1]. (*See* Docs. 1; 18-6.) The operative First Amended Complaint in this action raised

---

[1] The Amended Plan itself is reproduced at Doc. 18-3 and is cited hereafter as "AP". The Amended Plan, along with other public records cited in this decision, are properly the subject of judicial notice for their existence and content, although not

1

three causes of action under the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code §§ 21000 *et seq.*, along with a cause of action based upon the federal constitutional intergovernmental immunity ("IGI") doctrine. (Doc. 14.) The United States' state court complaint alleges the same three causes of action under CEQA but omits the IGI claim. (Doc. 18-6.)

In July 2019, the State Board moved to dismiss the FAC, arguing the entire case should be dismissed pursuant to various abstention doctrines and that the IGI claim was both unripe and failed to state a claim. (*See* Doc. 17.) On December 2, 2019, a previously assigned district judge applied *Colorado River* abstention to stay the state law (CEQA) claims, while allowing the federal IGI claim to proceed. (Doc. 28.) The United States appealed, and the Ninth Circuit reversed, clarifying that imposing a partial *Colorado River* stay would only be appropriate in very narrow circumstances not applicable in this case and remanding the case to "allow all of the United States' claims to proceed, subject to regular issues of justiciability." (Doc. 49.) As mentioned, the ripeness of the IGI claim was raised in the initial motion to dismiss briefing (*see* Docs. 17, 20, 21), and was the subject of supplemental briefing (Docs. 28, 31, 40, 47, 48), but that issue has yet to be addressed.

Following the issuance of the mandate on April 19, 2021, the Court stayed the case at the request of the parties for more than ten months to permit settlement discussions to proceed. (*See* Docs. 51–59.) When it became clear that the case would not resolve, the Court ordered the parties to file another round of supplemental briefs to update the Court on any recent developments bearing on ripeness. (*See* Docs. 52, 53, 59.) Shortly thereafter, on April 13, 2022, the matter was reassigned to the undersigned. (Doc. 62.) The supplemental briefing was complete as of April 21, 2022. (Doc. 64.)

For the reasons set forth below, the Court finds that the IGI claim as presently articulated is not ripe for judicial review at this time and dismisses that claim. In addition, the Court calls for supplemental concerning the Court's exercise of jurisdiction over the remaining state law claims.

## II.  BACKGROUND

The originally assigned district judge's summary of the factual background provides a concise foundation for the analysis in this order:

---

for the truth of the matters set forth therein. Fed. R. Evid. 201; *Lee v. City of Los Angeles*, 250 F.3d 668, 688–90 (9th Cir. 2001).

> The history of regulation and litigation of issues related to the San Francisco Bay/Sacramento-San Joaquin Delta Estuary ("Bay-Delta") is long, wide, and deep. Without question, the Bay-Delta itself is a critically important natural resource that is both the hub of California's water supply and a vital estuary and wetland supporting numerous beneficial uses. Central to the present dispute is the fact that the State Water Board holds authority under California's Porter-Cologne Water Quality Control Act, Cal. Water Code § 13000, *et seq.*, to adopt water quality control plans to protect the waters of California. The Board adopted its original Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary ("Bay-Delta Plan") in 1978, and amended that plan in 1991, 1995, and 2006. The most recent effort to amend the Bay-Delta Plan began in 2009, and, over a nine-year period, the Board considered various amendments and prepared environmental documentation analyzing the potential environmental impacts of the Bay Delta Plan Amendments under [the California Environmental Quality Act ("CEQA")].
>
> The Board held numerous publicly noticed meetings and reviewed thousands of comments regarding the proposed Amendments and related drafts of the Substitute Environmental Document ("SED") prepared in accordance with CEQA. On December 12, 2018, the Board adopted the SED and Amended Plan.
>
> In general, the Amendments are designed to accomplish several goals relevant to this case. First, they increase the flows required to be left in the three main salmon-bearing tributaries to the San Joaquin River (the Stanislaus, Tuolumne, and Merced Rivers) during critical months (February through June). These flow increases are designed to improve spawning, rearing, and migratory habitat conditions in the Lower San Joaquin River. The Board plans to implement the flow objectives "adaptively," within broad constraints, to adjust timing and flow patterns to better balance multiple beneficial uses when scientific information indicates doing so is appropriate.
>
> Second, the Amendments provide that the Board will include minimum reservoir carryover storage targets or other requirements to ensure that providing the flows to meet the objectives will not have adverse temperature or other impacts on fish and wildlife.
>
> Third, the Amendments revise southern Delta salinity objectives for agriculture by adjusting the salinity requirements/restrictions to a slightly <u>higher</u> level, ostensibly to reflect updated scientific knowledge of southern Delta salt levels that reasonably protect agriculture. More specifically, the Amended Plan revises the salinity objective for agricultural beneficial uses by <u>increasing</u> the April through August salinity objective from a mean daily electrical conductivity ("EC") of 0.7 deciSiemens per meter ("dS/m") to 1.0 dS/m, resulting in a 1.0 dS/m salinity objective for the

> four compliance locations year-round.
>
> Reclamation's existing [state-issued] water rights [permits] to operate the federal Central Valley Project ("CVP"), including its permits to operate the New Melones Project, a component of the CVP, currently require Reclamation to meet the [pre-]existing salinity objective of 0.7 dS/m at these locations. The Amended Plan proposes to implement the [revised] salinity objective for the interior southern Delta by requiring Reclamation to continue operating to meet the 0.7 dS/m salinity limit at Vernalis as required by its existing water rights. The Amended Plan also proposes to implement the salinity objective through increased inflows provided by application of flow-based (as opposed to salinity-based) objectives for the Lower San Joaquin River.

(Doc. 28 at 2–4) (citations omitted) (emphasis in original). In sum, the Amended Plan relaxes the salinity limits in the southern Delta, but nonetheless indicates that Reclamation must operate as though the salinity limits have not been relaxed. The United States' IGI claim asserts "[b]y imposing on Reclamation, in its operation of a federal reclamation project authorized by Congress, a more stringent salinity requirement at Vernalis than all others, the Board Amendments discriminate against the Federal Government." (FAC, ¶ 88.)

### III. STANDARD OF DECISION[2]

The district court is a court of limited jurisdiction and is empowered only to hear disputes "authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Exxon Mobil Corp v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). The federal courts are "presumed to lack jurisdiction in a particular case, unless the contrary affirmatively appears." *A-Z Int'l. v. Phillips*, 323 F.3d 1141, 1145 (9th Cir. 2003). Thus, a plaintiff carries the burden of demonstrating the Court has subject matter jurisdiction. *Kokkonen*, 511 U.S. at 377; *Vacek v. United States Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may challenge a claim for relief for lack of subject matter jurisdiction. A motion to dismiss under Rule 12(b)(1) "may either

---

[2] The primary issue before the Court concerns prudential ripeness. Though there is some debate in the caselaw over whether prudential ripeness is truly jurisdictional in all contexts, *see Horne v. Dep't of Agric.*, 569 U.S. 513, 526 (2013) (questioning whether the "prudential ripeness" inquiry applicable in takings cases is jurisdictional), it appears to be routine to evaluate most motions to dismiss premised upon prudential ripeness under Federal Rule of Civil Procedure 12(b)(1). *See, e.g., Underwood v. Mackay*, 614 F. App'x 871, 871–72 (9th Cir. 2015); *Bugarin v. All Nippon Airways Co.*, 513 F. Supp. 3d 1172, 1184 (N.D. Cal. 2021); *Buena Vista Rancheria of Me-Wuk Indians v. Pac. Coast Bldg. Prod., Inc.*, No. 2:23-CV-00168-WBS-CKD, 2023 WL 4007716, at *2 (E.D. Cal. June 14, 2023).

4

attack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Pub. Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (citing *Land v. Dollar*, 330 U.S. 731, 735 (1947)). Thus, "[a] jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). The Ninth Circuit explained:

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004). On a motion to dismiss under Rule 12(b)(1), the standards that must be applied by the Court vary according to the nature of the jurisdictional challenge.

If a defendant presents a *facial* challenge to jurisdiction, the Court must presume the truth of the plaintiff's factual allegations "and draw all reasonable inferences in his favor." *Doe v. Holy*, 557 F.3d 1066, 1073 (9th Cir. 2009); *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.1 (9th Cir. 2003), *cert. denied*, 541 U.S. 1009 (2004). The Court should not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

On the other hand, if a defendant presents a *factual* challenge to the Court's jurisdiction, the Court "may review any evidence, such as affidavits and testimony." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989); *Safe Air*, 373 F.3d at 1039 (In resolving a factual attack on jurisdiction, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."). If a moving party presents a factual attack motion, "the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage*, 343 F.3d at 1039 n.2 (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)). Thus, the burden of proof remains with a plaintiff, who has "an affirmative obligation to support jurisdictional allegations with

proof." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016).

## IV. ANALYSIS

### A. IGI Doctrine Generally

The IGI Doctrine is grounded in the Supremacy Clause of the United States Constitution, *see Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014), and generally prohibits any "state or local law that directly regulates the conduct of the federal government or discriminates against it . . . , even if it is no more restrictive than federal law." *United States v. City of Arcata*, 629 F.3d 986, 991–92 (9th Cir. 2010). The United States does not invoke the "direct regulation" prong of the IGI Doctrine, focusing its allegations instead on the theory that the Amended Plan unlawfully discriminates against the United States. (*See* FAC, ¶¶ 83–94.)[3]

There are two elements to any IGI claim: "Intergovernmental immunity attaches only to state laws that [1] discriminate against the federal government and [2] burden it in some way." *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019). "A state or local law discriminates against the federal government if 'it treats someone else better than it treats' the government." *Arcata*, 629 F.3d at 991 (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990)). Put another way, discriminatory regulations are those that are not also imposed on "similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438; *United States v. New Jersey*, No. CV-20-1364 (FLW) (TJB), 2021 WL 252270, at *14 (D.N.J. Jan. 26, 2021) (dismissing United States' IGI claim against state regulation that placed limits on state law enforcement sharing information with the federal civil immigration authorities because United States failed to identify examples of similarly situated civil authorities that the state treated better than it treated the United States). Even regulations that discriminate against the government may survive scrutiny if, "the inconsistency is directly related to and justified by significant differences between the two classes." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 804 (1989)

---

[3] As a matter of law, it is well established that the State of California may lawfully apply its regulatory authority <u>directly</u> to water rights held by the federal government for a federal reclamation project, so long as doing so is not inconsistent with clear congressional directives regarding the reclamation project. *California v. United States*, 438 U.S. 645, 675 (1978) (explaining that Section 8 of the Reclamation Act of 1902 requires Reclamation to comply with state law related to the "control, appropriation, use, or distribution of water"). The United States acknowledges as much in its complaint. (FAC, ¶ 87.) There are limits to this the State Board's authority. It cannot, for example, impose conditions that are "inconsistent with clear congressional directives respecting the project" in question, *California*, 438 U.S. at 679. The complaint in this case does not suggest that the Amended Plan does this and focuses instead on the "discrimination" standard. (FAC, ¶¶ 83–94.)

6

(citation and quotation marks omitted).

B.  **State Board's Ripeness Challenge**

The State Board argues that the IGI claim is not yet ripe for adjudication. (Doc. 17-1 at 30–31.) Ripeness has both constitutional and prudential components. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). The constitutional component "is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Id.* In assessing the constitutional component, a court must "consider whether the plaintiff faces "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," or whether the alleged injury is too "imaginary" or "speculative" to support jurisdiction. *Id*. at 1139. The State Board does not appear to contest the constitutional component of ripeness here.

"Prudential considerations of ripeness are discretionary." *Thomas*, 220 F.3d at 1142. In evaluating the prudential component of ripeness, courts generally assess 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 779–80 (9th Cir. 2000) (citation omitted); *see also Nat'l Park Hospitality*, 538 U.S. 803, 808 (2003) (evaluating whether administrative action is ripe by examining "(1) the issues' fitness for judicial decision and (2) the hardship to the parties of withholding court consideration"). Some courts apply a slightly more developed, three-pronged test when evaluating the prudential component of ripeness. In *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998), the Supreme Court considered "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *See also Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv*., 653 F. Supp. 2d 1066, 1083–89 (E.D. Cal. 2009) (applying *Ohio Forestry* test).

The State Board argues that until the Amended Plan has been "implemented"[4] it is not possible for the Court to determine if similarly situated persons have been treated differently. (Doc. 17-1 at 31; *see also* Doc. 21 at 10 ("The State [ ] Board has yet to impose obligations on any water users under the

---

[4] According to the State Board, the Amended Plan is "not self-implementing." (Doc. 17-1 at 11.) Rather, the State Board "will implement the revised flow and salinity objectives through future water right or water quality actions." (*Id*.)

7

Amended Plan and until it does so it is impossible to determine whether the releases required [of Reclamation] to meet the salinity limit will be more burdensome than releases required of others.").) In addition, whether a burden is discriminatory must be viewed in the context of the entire regulatory program. (*Id.*) As the State Board highlights, the United States' claim focuses on only one component of a broader regulatory program. (Doc. 31 at 5.) The State Board asserts that assignment of responsibility is likely to be a complex and lengthy process, with the State Board attempting to influence salinity through various means. (*Id.* at 11.) The State Board offers more detailed arguments corresponding to the three *Ohio Forestry* factors, which the Court discusses below.

C.      **Hardship Caused by Delay**

"'To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)). Delayed review alone ordinarily is not a sufficient hardship to render a challenge ripe, "absent showing that delay will result in irreparable losses, intrusion into daily business decision-making, or the imposition of a Hobson's choice of whether to comply with a possibly invalid regulation or to violate it in order to challenge it." *U.S. W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1119 (9th Cir. 1999).

The State Board asserts that Reclamation could not possibly be harmed by the Amended Plan because the Amended Plan did not change Reclamation's obligations. (Doc. 17-1 at 31.) Relatedly, the Board claims that it cannot enforce any new obligation set forth in the Amended Plan until the Plan is implemented, so the Amended Plan does not force Reclamation to *modify* its behavior in any way. (Doc. 31 at 14.) It is technically true that the Amended Plan did not alter Reclamation's obligations. The Amended Plan specifically indicated as much. (AP at p. 34[5] ("As part of implementing the salinity water quality objective for the interior southern Delta, [Reclamation] shall be required to continue to comply with [preexisting] salinity levels, as a condition of its water rights.").) But, as Reclamation puts it: "the

---

[5] Unless otherwise indicated, the Court's page references refer to the page number of the .pdf file available on the Court's electronic filing system. (E.g., Doc. X at ##.) However, when the Court wishes to refer to the internal page number of a particular record document, it will refer to that document by its name or abbreviated name followed by "p. ##."

8

fact that Reclamation currently remains bound by the prior, more stringent objectives is precisely the point and precisely what Reclamation is challenging in this litigation." (Doc. 40 at 12.)

It is undisputed that the Amended Plan presently calls upon Reclamation to continue to meet a salinity standard of 0.7 dS/m[6] during September through March—a standard that is more stringent than the revised, more relaxed (i.e., higher/saltier) standard of 1.0 dS/m. (AP at p. 34; FAC, ¶ 85.) It is also undisputed that the State Board found the latter, more relaxed standard protective of agricultural beneficial uses in the Delta. (AP at p. 12; FAC, ¶ 85.) It is plausibly alleged that the 0.7 dS/m salinity standard applicable to Reclamation requires Reclamation to release water to ensure compliance with the objective, thereby reducing water available for delivery under contracts the federal government presently holds with irrigation and water districts. (FAC, ¶¶ 9–10.) This, in turn, impairs Reclamation's ability to satisfy the Congressionally authorized purposes of the New Melones Project, including the provision of water for irrigation, municipal and industrial purposes, power generation, and recreation. (*Id.*, ¶¶ 7, 10.) Though implementation of the Amended Plan is not complete, Reclamation argues it was immediately harmed upon adoption of the Amended Plan. This is because, without the specific requirement that Reclamation continue to meet the 0.7 dS/m standard, Reclamation could have petitioned the Board immediately to amend its water rights permits to operate to the 1.0 dS/m standard. (Doc. 40 at 6, 8, 9, 10, 12.) In the past, when water quality standards have been relaxed, Reclamation has petitioned the Board to amend its water right permits, and those petitions were subsequently granted. (Declaration of Richard J. Woodley, Doc. 40-1, ¶ 7.)[7] The Board does not appear to refute this assertion.

On this point, the Court agrees with the United States. The State Board's arguments—that no harm is done because Reclamation's obligations have not "changed"—ignores the undisputed showing by the United States that continued imposition of the more stringent standard upon Reclamation prevents Reclamation from petitioning to conform its permit(s) to the less stringent standard. Nothing in the present record suggests anything (other than the imposition of the more stringent standard upon

---

[6] The complaint references the relevant water quality standards using the dS/m unit, while other documents in the record occasionally use a different unit of measurement, millimhos/centimeter ("mmhos/cm"). (AP at p. 12.) These units appear to be equivalent/interchangeable.

[7] As is the case with much of the material offered in support of the briefing on ripeness, this paragraph of the Woodley declaration is supported by judicially noticeable information contained in public records, such as the filing of petitions and the granting of those petitions. *See supra* note 1.

Reclamation) would prevent reclamation from immediately petitioning to take advantage of the relaxed standard. If past practice is a guide, the record also suggests that such a petition would likely be granted. Given the lack of any showing to the contrary, the Court concludes the Amended Plan causes Reclamation direct and immediate hardship.

**D.      Further Factual Development**

The State Board argues that the Court's decision-making would benefit from further factual development because additional facts would help the Court determine whether the Amended Plan indeed violates the IGI doctrine. (Doc. 31 at 16.) In the relevant factors, the Court must consider the "broader regulatory context" because a state provision that appears to treat the United States differently on the most specific level of analysis may not be discriminatory in the broader context. *North Dakota*, 495 U.S. at 438.

The State Board argues that the "broader regulatory context" in this case includes implementation of the water quality objectives and other measures that have been included in the Bay-Delta Plan Amendments. (Doc. 31 at 6.) Furthermore, the State Board argues that the "significant differences" between Reclamation and other water right holders in the San Joaquin River Basin necessitate further factual development. (*Id*.) According to the Board, "[a]t this point, without further factual development occurring during the implementation phase, the Court cannot evaluate whether the Federal Government is being treated better or worse than any other party nor whether there are significant differences between the Federal Government and others justifying inconsistent burdens." (*Id*.) This argument continues as follows:

> The facts regarding the burdens imposed on Reclamation and any basis for inconsistent treatment will not be fully developed until the Board has received evidence about the characteristics and impacts of the various water users in the watershed and assigned responsibilities for meeting the objectives. It is premature to adjudicate the IGI claim before these facts are developed for the record.

(Doc. 31 at 18–19.)

The State Board's initial briefs provided some examples of possible ways further regulatory action might inform the relevant inquiry. In the past, the State Board has included in the water rights permits held by junior water right holders (i.e., those who hold rights lower in priority than

Reclamation) terms that require curtailment of water diversions when Reclamation is releasing water to meet a water quality objective. (Doc. 31 at 16.) Standard Permit Term 91, which has been included in certain water rights permits since 1978, prohibits diversion of water when stored water is being released by Reclamation and DWR to meet Delta water quality objectives. (Doc. 32-3 at 8); *El Dorado Irrigation Dist. v. State Water Res. Control Bd.*, 142 Cal. App. 4th 937 (2006). Likewise, Standard Permit Term 93, which has been included in certain permits in the San Joaquin River system since 1983, provides that diversions are prohibited when Reclamation is releasing water from New Melones to maintain water quality at Vernalis. (Doc. 32-3 at 59–60.) According to the Board, Terms 91 and 93 reflect the State Board's determination that other junior water right holders must "share in the responsibility of meeting Delta water quality standards by curtailing diversions." (*Id*. at 10.)[8]

The United States addresses this argument obliquely, suggesting that further factual development is unnecessary because "[t]he Amended plan on its face establishes disparate treatment of Reclamation,

---

[8] Related to this point, the State Board also attempts to invoke the second *Ohio Forestry* factor, which permits the Court to consider whether judicial intervention would interfere with the State Board's administrative Process (Doc. 31 at 15 (citing *Ohio Forestry*, 523 U.S. at 735 "([P]remature review 'denies the agency an opportunity to correct its own mistakes and to apply its expertise'[ ].").) The State Board argues that it should be allowed to refine its policy vis-à-vis Reclamation during the implementation phase by, among other things, "consider[ing] further refinements to the Bay-Delta Plan itself." (*Id*. ("The Board should be given the opportunity to allocate responsibilities and possibly revise the Plan itself prior to Court intervention.").) This argument is not convincing for several reasons. First, the "interference with administrative process" factor was articulated in *Ohio Forestry* in the context of a challenge to a program-wide Forest Plan and related regulatory regime that provided a specific pathway for revision of the Forest Plan in the face of a site-specific project that did not conform to that plan. *See Ohio Forestry*, 523 U.S. at 735 (citing 53 Fed. Reg. 23807, 26836 (1988) (setting forth specific procedure for amending Forest Plan in face of a conflicting site-specific plan)). This factor is most often found dispositive in similar situations, where waiting for site-specific implementation will afford meaningful opportunities to amend a broader regulatory regime, *see Citizens for Better Forestry v. U.S. Dep't of Agric.*, No. C 05-1144 PJH, 2006 WL 1072043, *5 (N.D. Cal. Apr. 21, 2006) (applying *Ohio Forestry*'s interference factor to find a claim unripe where relevant regulation could be amended or refined prior to any site-specific action); *Or. Nat. Desert Ass'n v. Shuford*, No. CIV. 06-242-AA, 2007 WL 1695162, *15 (D. Or. June 8, 2007), *aff'd sub nom. Or. Nat. Desert Ass'n v. McDaniel*, 405 F. App'x 197 (9th Cir. 2010) (finding unripe a challenge to grazing management plan because agency could adjust the specific terms and conditions at the site-specific level), or in other situations where an agency's action remains truly uncertain, *see S. Cal. Inst. of L. v. Biggers*, No. SACV 13-193 JVS (RNBsx), 2013 WL 11317728, at *7 (C.D. Cal. June 12, 2013) (finding that deprivation of asserted property interest remained "only conjectural"). In contrast, the factor does not come into play when an agency has reached a final policy decision. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006) (judicial review of biological opinion would not impermissibly interfere with further administrative action because policy was fixed upon issuance of biological opinion). This case is not a situation in which further site-specific action may change the Amended Plan's <u>policy toward Reclamation</u>; rather, as discussed in the body of this order, further administrative action may modify how the Amended Plan impacts <u>other water users</u> and therefore how the IGI claim will be evaluated. The Board's policy toward Reclamation is "at an administrative resting place" and therefore judicial review will not interfere with further administrative action vis-à-vis Reclamation. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir. 2003). As the United States points out, "[i]f a government agency's contention that it might amend a decision in the future means that a challenge to that decision is not ripe, then governmental decision-making would rarely be subject to challenge." (Doc. 40 at 16.) The Court agrees with the United States on this. To find otherwise would turn this *Ohio Forestry* factor into a black hole that would absorb almost any administrative action and render it unripe.

11

by singling it out to continue to meet the prior, more stringent salinity objective." (Doc. 40 at 17.) According to the United States, delaying review until after the Board implements the Amended Plan because the Board "*might* impose different types of obligations on other water users (such as curtailing diversions) to 'assist' in meeting the salinity objectives," does nothing to overcome the fact that the Board has not "m[ade] any representation that it might impose the prior, more stringent standard on anybody other than Reclamation at the relevant compliance point." (*Id*. at 18.)

Though the United States' arguments seem logical at first glance, they largely miss the more essential point by presuming that the United States is similarly situated to other water users. The Court cannot tell from the complaint or any other document in the record which water users the United States considers to be comparators.[9] Assuming comparators can be identified, the relevant authorities appear to require that the Court determine: (1) whether those water users are in fact similarly situated; (2) whether they are being treated differently in some material way vis-à-vis Reclamation; and whether "significant differences between the two classes justify the [disparate] burden." *United States v. Kernen Constr*., 349 F. Supp. 3d 988, 993 (E.D. Cal. 2018) (citing *North Dakota*, 495 U.S. at 438). It is unclear how the Court can will perform this analysis without knowing the magnitude of the disparate impact (i.e., how the impacts to the United States compare to the impacts to other water users), the nature of the other water users, and the reasons why the State Board imposes different obligations upon other water users vis-à-vis Reclamation. As a practical matter, the Court cannot properly undertake its duties until the Board completes implementation as to at least some purportedly similar water user(s).[10]

---

[9] It appears to be well established that Reclamation is a highly unique water user in many ways, including being one of the principle causes of salinity exceedances at Vernalis. (*See* FAC, ¶ 90 (acknowledging and not challenging the Board's assertion that the Board's Decision 1641 found "that Reclamation was the principle cause of salinity exceedances at Vernalis").) The complaint in this case alleges that other factors and water users contribute to salinity problems downstream of Vernalis and that "the Amended Plan ignores all of these sources of salinity problems (other than the CVP and [State Water Project], and instead [] requires Reclamation to mitigate salinity impacts caused by other users." (FAC, ¶ 91.) That others contribute to salinity problems does not—at least not obviously—address the need to identify similarly situated water users.

[10] The Court is unpersuaded by *amicus curiae*'s argument that the United States is advancing a "purely legal claim" and therefore that further factual development is unnecessary. (Doc. 47 at 10 (*citing Hotel Emples. & Rest. Emples. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1513 (9th Cir. 1993) (holding that facial preemption challenge to a reporting and disclosure requirement a gaming regulatory system was ripe for review because it was "predominantly a legal question, resolution of which would not be aided greatly by development of a more complete factual record").) That the United States attempts to frame its IGI claim as a purely legal one does not make it so. As discussed, the very nature of the IGI claim asserted in this case demands factual comparisons to how other water users are treated. Hypothetically, a plaintiff could bring an IGI claim that is purely legal under a "direct regulation" theory. *See North Dakota*, 495 U.S. at 435 ("A state regulation is

The supplemental briefing filed in May and June of 2022 discusses several sets of examples of how the Board is implementing the Amended Plan as to some water users other than Reclamation. The parties largely agree on the procedural status of those examples but not on how those implementation efforts bear on the question of ripeness. The Court has examined each in detail.

### 1. Development of Comprehensive Operations Plan

The United States' supplemental briefs emphasize the Amended Plan's requirement that Reclamation and the California Department of Water Resources together develop a "Comprehensive Operations Plan" that, among other things, will address measures to meet the salinity objectives of the Amended Plan. (AP at p. 36.) The United States concedes that the COP is still under development. (Doc. 66 at 2.) However, the United States points to a July 9, 2019, letter sent by the State Board to Reclamation requesting that it submit a draft COP by August 25, 2019. (Doc. 61-3.) That letter expressly stated that "[t]he amendments, including revised salinity objectives, were approved by the Office of Administrative Law on February 25, 2019 and are now in effect under state law." *Id*. This, according to the United States, demonstrates that "nothing can or will change with respect to Reclamation's salinity obligations under the Amended Plan." *Id*. This reiterates the basic problem with the United States' argument: it has not identified a comparator. Even assuming the facially disparate obligation imposed upon Reclamation under the Amended Plan remains in place, this establishes only one element of the IGi claim. The Court still must be able to compare the requirements imposed upon Reclamation to those imposed upon others and the justification(s) for any disparate treatment.

### 2. Water Quality Certifications for FERC Relicensing on the Merced and Tuolumne Rivers

Merced Irrigation District ("Merced"), which operates hydroelectric facilities on the Merced River, and Turlock Irrigation District and Merced Irrigation District ("TID/MID"), which jointly operate hydroelectric projects on the Tuolumne River, presently are pursuing renewal of licenses for those projects with the Federal Energy Regulatory Commission("FERC"). (*See* Docs. 60-3, 60-4.) As part of

---

invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals."). However, as noted above, the United States does not appear to advance a "direct regulation" IGI claim here, even though direct regulation is undisputedly occurring, focusing its allegations instead on the theory that the Amended Plan unlawfully discriminates against the United States. *See supra* note 3.

that relicensing process, the applicants are required to provide a certification that their operations will comply with state water quality laws. 33 U.S.C. 1341(a)(1), (d). Under California law, the State Board is authorized to provide such certifications, when appropriate. Cal. Water Code § 13160(b)(1); Cal. Code Regs, tit. 23, § 3838(a).

In early 2021, the State Board issued the certifications for the TID/MID projects. (Docs. 60-3, 60-4.) Both certifications provide that the licensee "shall not divert water when, in order to meet the southern Delta salinity objective established in the [Amended Plan], [Reclamation] is releasing stored water from New Melones Reservoir to avoid exceedance of 0.7 [] (dS/m) electrical conductivitiy (EC) at Vernalis (April – August) and 1.0 dS/m EC at Vernalis (September– March)." (Docs. 60-3 at 46, 60-4 at 62.) The licensees are required to consult with Board staff monthly during times when Reclamation may release stored water to achieve the Vernalis salinity requirement to determine whether the condition applies. ((Doc. 60-3 at 46–47, 60-4 at 62.) The condition does not apply when curtailing diversions would not be effective in lowering salinity concentration at Vernalis. (Doc. 60-3 at 47, 60-4 at 62.)

In early 2019, the D.C. Circuit decided *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019), which held that the State Board had waived its authority to issue a water quality certification in relation to the FERC relicensing application at issue in that case. Considering *Hoopa Valley* and to avoid the State Board's imposition of conditions upon their projects, Merced and TID/MID petitioned FERC for a determination that the State of California had waived its certification authority as to their re-licensing applications. *See Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179, 1182 (D.C. Cir. 2022), *cert. denied,* 143 S. Ct. 1746, 215 L. Ed. 2d 648 (2023); *Cal. State Water Res. Control Bd. ("SWRCB") v. FERC*, 43 F.4th 920, 923 (9th Cir. 2022), *cert. denied sub nom. Nevada Irrigation Dist. v. SWRCB.*, 143 S. Ct. 2459, 216 L. Ed. 2d 431 (2023). At the administrative level, FERC found that the State Board had not waived its authority as to TID/MID, *Turlock*, 36 F.4th at 1182–83, but had waived its authority as to Merced, *SWRCB*, 43 F.4th at 923. On appeal, the Ninth Circuit found that there had been no waiver as to any of the FERC re-licensing applications. *Turlock*, 36 F.4th 1179; *SWRCB*, 43 F.4th 920.

The culmination of that litigation resolves only that the conditions imposed by the State Board on the Merced and TID/MID licenses as part of the certification process are not barred because of waiver. However, other questions remain. For one, FERC has yet to issue licenses to Merced or

TID/MID; the relicensing process is ongoing. (*See* Doc. 66 at 6.) In addition, Merced and TID/MID are pursuing separate lawsuits in state court challenging the water quality certifications on other grounds. *See Merced Irrigation Dist. vs. SWRCB et al.,* Madera County Superior Ct., Case No. MCV087985; *Turlock Irrigation Dist. et al., v. SWRCB. et al.*, Tuolumne County Superior Ct., Case No. CV63819; *City and County of San Francisco by and through its Public Utilities Commission v. SWRCB. et al.*, Tuolumne County Superior Ct., Case No. CV63838. Those state law cases remain pending before those trial courts. In sum, it remains unclear when the conditions imposed upon Merced and/or TID/MID by the State Board will be implemented, let alone when the impacts of those conditions will become clear enough to shed light on this Court's analysis of the IGI claim presented here.

### 3. State Board's Initiation of Rulemaking to Allocate Responsibility for Implementing Lower Jan Joaquin River Flow and Southern Delta Salinity Components of the Amended Plan

In a joint status report filed August 9, 2023, the State Board reports on a related development that it believes bears on the prudential ripeness issue. (Doc. 66 at 7.) On August 8, 2022, the State Board initiated a rulemaking process for a proposed regulation to allocate responsibility to water rights holders for implementing the Lower San Joaquin River flow and southern Delta salinity components of the Amended Plan. *See* SWRCB, Revised Notice of Preparation of CEQA Scoping Meeting, *available at*: https://www.waterboards.ca.gov/public_notices/notices/revised_notice_ceqa_baydelta_nop.pdf (last visited August 29, 2023). According to the State Board, once that rulemaking process is complete, "the full scope of responsibility for water right holders' contributions to meeting unimpaired flows and salinity requirements—and any correlative benefits from flows to achieving lower salinity downstream—will be known and the relative position of the United States will be well developed." (Doc. 66 at 7.) The State Board maintains that only then "will the Court be able to weigh the burdens imposed on Reclamation against the burdens imposed on others and the basis for imposing responsibility." (*Id*.) The United States did not address these points.

Though it is unclear when this regulatory process will be complete, the Court finds the State Board's arguments on this matter compelling. It appears that the subjects covered by this rulemaking are likely to bear materially on the issues the Court must evaluate to resolve the United States' IGI claim.

**E.     Synthesis**

Considering the above examples, the Court is convinced that further factual development will aid the Court's decision making in this case. To evaluate the IGI claim, the Court must be able to compare the impacts of the Amended Plan on Reclamation to the impacts upon some comparator entity. At this time, it is unclear how the Court could do so. In addition, the State Board has pointed to ongoing rulemaking procedures that are designed to get at the heart of the key issues. The Court finds the "further factual development" factor weighs strongly against a finding of prudential ripeness.

The Court fully understands the United States' frustration with the situation. As discussed above, the United States has plausibly alleged it is being harmed by the requirement that it continue to abide by a salinity standard that is more stringent than the standard applied to all other water users under the Amended Plan. The hardship factor "serves as a counterbalance to any interest the judiciary has in delaying consideration of a case." *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012); *Health Care Auth. v. Azar*, No. 3:19-CV-06137-BHS-TLF, 2020 WL 7049324, at *7 (W.D. Wash. July 27, 2020), *report and recommendation adopted*, No. 3:19-CV-06137-BHS, 2020 WL 6336456 (W.D. Wash. Oct. 29, 2020) (declining to evaluate hardship where claim was otherwise fit for judicial review); *see also Alaska Airlines Inc. v. Schurke*, No. C11-0616JLR, 2012 WL 503862, at *13 (W.D. Wash. Feb. 14, 2012) (finding the plaintiff will not "suffer a direct and immediate hardship that is significant enough to justify the court's exercise of jurisdiction over this matter at this time").

The Court is also sympathetic to the United States' contention that "implementation" of the Amended Plan by the Board has no set timeframe. (Doc. 64 at 5.) The Board, in fact, concedes that implementation is "in the beginning stage." (Doc. 60 at 4.) The prudential ripeness jurisprudence does not speak directly to the amount of time a Court should permit for the development of additional facts. But what is clear is that it allows the Court to avoid engaging in the merits until the facts will permit it to evaluate properly the issue before it. That time is not now, at least not based upon the present allegations in this matter.[11] The motion to dismiss the IGI claim on prudential ripeness grounds is **GRANTED**.

---

[11] The United States has not requested leave to amend its IGI claim, nor can the Court envision how the claim could be amended now to cure the ripeness issues identified herein.

16

### F. Remaining Claims

This leaves up for consideration the status of the remaining claims in this case, all of which arise under state law and are before this Court pursuant to 28 U.S.C. § 1345 (providing for district court jurisdiction where the United States is the plaintiff). This Court previously found it would be appropriate to stay those claims pursuant to the abstention doctrine set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), (Doc. 28 at 22–28), but the Ninth Circuit reversed as to that determination, finding that (1) the *Colorado River* abstention doctrine generally does not allow a court to impose a partial stay; (2) the presence of claims in the federal suit that do not overlap those in the state suit (i.e., the IGI claim) give rise to a presumption that *Colorado River* is inapplicable; (3) and nothing about the United States' litigation strategy overcomes that presumption. (Doc. 49.) Dismissal of the IGI claim has, at least arguably, upset the circumstances in place when the Ninth Circuit ruled. In addition, in the interim the parallel state law cases have proceeded forward. Accordingly, **within 30 days of the date of this order**, the Court directs the parties to submit supplemental briefs, no longer than 10 pages in length, addressing applicability of *Colorado River* given the present procedural posture of the case.

IT IS SO ORDERED.

Dated: **August 30, 2023**　　　　　　　　　　　　／s／ Jennifer L. Thurston
　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

17